## Waschak *v.* Moffat, Appellant.

210

Argued November 17, 1952.

*Bernard G. Segal,* with him *Edward W. Mullinix, James W. Scanlon, Matthew D. Mackie, Wm. A. Schnader, Welles & Mackie* and *Schnader, Harrison, Segal & Lewis,* for appellants.

*Raymond T. Law,* with him *Will Leach* and *John R. Lenahan,* for appellees.

Opinion by Hirt, J., April 15, 1953:

Plaintiffs, in June 1948, bought a house and lot on Main Street in the Borough of Taylor, Lackawanna County, which they occupied as their home. In Octo-

ber 1948 in repainting the house they used paint with a white lead base. Within six months the painted surface of the building became discolored and finally changed from its initial white to a permanent black. Based upon tests made by a competent chemist there was testimony in the court below that in the neighborhood of plaintiffs' house there was a concentration in the atmosphere of between one and two parts per million of hydrogen sulphide. It is conceded that the gas in that degree of concentration came from defendants' culm dumps and that the paint damage on plaintiffs' property resulted from the chemical reaction of hydrogen sulphide on the white lead in the paint which changed it to black lead sulphide. This suit was brought by plaintiffs to recover damages both to their house and for personal discomfort caused by hydrogen sulphide from defendants' culm banks. The case was well tried in the court below and resulted in a verdict of $1,250 for the plaintiffs. Defendants' sole complaint in this appeal is that the court erred in submitting the question of liability for nuisance to the jury. It is defendants' contention that they are not responsible as a matter of law under the facts in this case, and that the judgment entered on the verdict therefore must be reversed and here entered in their favor.

In the light of the verdict, based upon testimony in which there is little dispute, these material facts appear: For more than 50 years coal mining has been the most important industry in the Borough of Taylor. Glen Alden Coal Company owned large tracts of land in the borough extending into the township on which it had conducted extensive mining operations during that period. It processed the coal at a large breaker in the borough, located within a few hundred feet of the property now owned by the plaintiffs. In accordance with the general practice, and with the consent

of the borough, Glen Alden deposited the by-products of mining, consisting of waste material and coal which could be made saleable by reprocessing, in a culm bank as close to the breaker as possible without interfering with its operation. Glen Alden ceased operating the mines in 1932 and there was then a large refuse dump near the breaker. In 1937 the defendants undertook to reopen the mines and among the lands then leased to them by Glen Alden, were two large tracts, one fronting 2,500 feet on Washington Street in the borough, and the other near the breaker extending along Main Street for about one-half mile. Defendants from 1937 to 1944 by means of a conveyor line from the breaker, built up an extensive bank of culm or reclaimable sulphurous coal adjacent to the existing Glen Alden bank, referred to as the Main Street dump. This bank was abandoned in 1944 when it started to burn. In the years that followed defendants, from necessity, turned to other locations for their culm banks. In 1944 they started to deposit culm on Washington Street, within the borough, which ultimately developed into a bank 10 to 60 feet high extending 800 feet along Washington Street and 750 feet along an alley in the rear of Union Street. This bank began to burn in 1948 and further dumping was then discontinued. Defendants then began the construction of a large settling basin near their Main Street dump. The walls of the so-called "silt dam" were 25 feet high and were constructed principally of breaker refuse. The function of the structure was to separate silt from the water used in processing coal at the breaker, to comply with the Act of June 22, 1937, P. L. 1987, 35 PS §691.1 et seq., before discharging it into natural streams. Still another culm bank was started in 1949 on Fourth Street in the borough and defendants continued to deposit wastes from the mine at that location until May, 1951, when this dump

also began to burn. The Fourth Street bank was 500 feet in length, 500 feet wide and 40 feet high. Extensive ramps to the dump were also made of breaker refuse material. Defendants are now using a new location as a dumping ground, between the Washington and . the Fourth Street culm banks.

The complaint in this case charged defendants with the creation of a nuisance resulting from the release of poisonous and obnoxious gases. Sulphur dioxide was discharged from the burning dumps but the proofs relate to damages caused by hydrogen sulphide alone. Hydrogen sulphide may be generated in culm banks without fire and the evidence is that the gas in the atmosphere in the borough was emitted from two of defendants waste dumps, beginning in 1948, viz: the Washington Street bank and the silt dam around the settling basin. Section 822 of the Restatement, Torts,[1] sets forth some of the tests for determining liability resulting from a private nuisance. But we are unable to agree with defendants that they are relieved from liability under that section of the Restatement, although under the proofs, there was no intentional invasion of plaintiffs' use and enjoyment of their land and the defendants' conduct in the operation of their collieries was not negligent, reckless or ultrahazardous. Plaintiffs' claim is not ruled either for them or against them by the principles of the Restatement. On the

[1] §822, General Rule. "The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if, (a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and (b) the invasion is substantial; and (c) the actor's conduct is a legal cause of the invasion; and (d) the invasion is either (i) intentional and unreasonable; or (ii) unintentional and otherwise actionable under the Rules governing liability for negligent, reckless or ultrahazardous conduct."

other hand defendants' mining operations did not create an "absolute nuisance" in a legal sense and their liability therefore is not absolute, regardless of fault. The doctrine of liability without fault has had limited application in Pennsylvania and the trend of our judicial decisions has been to further restrict the scope of its operation rather than to expand it. Cf. *Summit Hotel Co. v. National Broadcasting Co.,* 336 Pa. 182, 188, 8 A. 2d 302, in which it was said, in quoting with approval from *Pennsylvania Coal Co. v. Sanderson,* 113 Pa. 126, 6 A. 453: " 'A rule which casts upon an innocent person the responsibility of an insurer is a hard one at best, and will not be generally applied unless required by some public policy, or the contract of the parties.' " In our view plaintiffs' claim though in part involving damages to real estate, does not come within the restricted field where the doctrine of liability without fault may be invoked.

The present case under the pleadings and the proofs is the converse of that before the Supreme Court in *Kramer v. Pittsburgh Coal Co.,* 341 Pa. 379, 19 A. 2d 362. There is much uncertainty in the law in dealing with nuisances and with their classification. But the facts in the instant case as pleaded and proved, clearly bring it within the principles discussed in the *Kramer* case. This instant case was properly tried as one involving liability for nuisance generally and not for damages resulting from negligence. As to *nuisance* in the sense with which we are concerned, it was said in the *Kramer* case: " 'The term . . . signifies in law such a use of property or such a course of conduct as, irrespective of actual trespass against others . . transgresses the just restrictions upon use or conduct which the proximity of other persons or property in civilized communities imposes upon what would otherwise be rightful freedom. In legal phraseology, the term "nui-

sance" is applied to that class of wrongs that arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real or personal, . . . and producing such material annoyance, inconvenience, discomfort or hurt that the law will presume a consequent damage. . . . The distinction between trespass and nuisance consists in the former being a direct infringement of one's right of property, while, in the latter, the infringement is the result of an act which is not wrongful in itself, but only in the consequences which may flow from it:' ", quoting from 46 C. J. 645-646.

It has been said that a " ' "fair test as to whether a business lawful in itself, or a particular use of property, constitutes a nuisance, is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case." ' " And that " ' "Whether the use is reasonable generally depends upon many and varied facts. No hard and fast rule controls the subject. A use that would be reasonable under one set of facts might be unreasonable under another" ' . . . No word is used more frequently in discussing cases of this kind than the word "reasonable", and no word is less susceptible of exact definition. What is reasonable under one set of circumstances is unreasonable under another. Custom itself has much to do with determining what is reasonable" ' ": *Hannum et al. v. Gruber et al.*, 346 Pa. 417, 423, 31 A. 2d 99.

Defendants' mining operation was lawful and in itself did not constitute a nuisance; the controlling question therefore was whether its business was conducted reasonably by them. This issue was fairly submitted to the jury in this language: ". . it is for you to determine whether the use made by the defendants of their land was a reasonable and natural use. In so doing

you take into consideration the facts and circumstances which are established by the credible evidence in the case. You consider the conditions present on the dumps maintained by the defendants. You take into consideration the size of the refuse piles, the location of the mining operations and the breaker. You consider the proximity of these refuse piles to dwellings and schools and churches and other structures, and the proximity of these piles and dumps to the plaintiffs' home. You consider the nature of the neighborhood and whether it is predominently industrial or predominently residential. You consider the standard of comfort residents of a mining community live under. You consider that persons in mining areas cannot expect to be free from discomfort and inconvenience to the extent that those who live in rural or farming areas are. You consider the importance and the necessity of the industry to the public and the length of time it has existed. You take into consideration the custom and practice in the mining industry as it has existed for years, and you also consider that because a given community is devoted to industry that fact does not authorize one to make use of his land without regard to serious effects on the property of his neighbors. You take into consideration the nature and the extent of the injury to the plaintiffs' property and determine from all the facts and circumstances whether what the defendants did and the conditions resulting therefrom was a reasonable and natural use of the land." The lease of the land to the defendants by Glen Alden provided: "The lessee may use the demised premises for the purpose of preparing for market coal mined by lessee from lands other than lands hereby demised and brought to the demised premises for such preparation and for no other purpose whatsoever." A vast quantity of coal was brought to Taylor from lands out-

side the borough and in referring to that fact the trial judge properly charged that the deposit of the waste within the borough in processing such coal was not a natural use of the land. Cf. *Lentz v. Carnegie,* 145 Pa. 612, 23 A. 219. And from the fact that hydrogen sulphide gas had not been generated in any of the existing Glen Alden culm banks, made up wholly of wastes from coal mined in the borough, it was a fair inference for the jury that a different chemical content in the foreign coal which defendants hauled to the borough and processed there, accounted for the presence of the gas in the atmosphere in Taylor. This inference, to which the plaintiffs are entitled, has a bearing on the reasonableness of defendants' conduct of its coal processing operation.

The verdict for plaintiffs in the sum of $1,250 based upon a finding of a mining operation conducted unreasonably in some respects, is adequately supported by the evidence. Hydrogen sulphide is noxious but under the evidence, the low concentration of the gas, amounting to little more than a trace in this case, as established by tests, did not present a hazard to the health of the residents of the borough. Plaintiffs' counsel at the trial stated of record that they were "not claiming health damages". And the court ruled without objection or exception, that there was "no such claim in this law suit" to be submitted to the jury.

The sole damage to plaintiffs' real estate as reflected in the verdict was properly measured by the cost of restoring the painted surface of their house to its former condition. The testimony which the jury accepted was that this could be accomplished by repainting the building with a white paint made on a titanium and zinc base which, unlike lead paint, does not discolor and is not otherwise affected by hydrogen sulphide. There was no competent evidence of permanent injury

to the building. Titanium paint is in general use and under the evidence is the equal of paint made from white lead. Cf. *Art Club v. Heyman and Goodman*, 325 Pa. 587, 190 A. 922. Moreover the jury were justified in the moderation exercised in allowing additional damages for physical discomfort. Plaintiffs, in buying the Taylor property in 1948 chose a mining community for their home subject to the burdens normally incident to mining operations. In 1948 the original Glen Alden bank was obviously burning, as it still is, and was discharging carbon dioxide gas. In addition there were at least two other extensive culm banks which had been built up by defendants and at the very time when plaintiffs bought the land the defendants were continuing the practice of depositing mining wastes within the borough. Plaintiffs bought with full knowledge of these facts. In spite of every precaution culm banks burn, spontaneously or otherwise, and in burning emit gases with offensive odors. Defendants did not start the fires nor did they omit any reasonable precaution to prevent them. There is evidence that they did take some measures to prevent the emission of hydrogen sulphide and to render the fires innocuous, though without success. Cf. *Hannum et al. v. Gruber et al.*, supra.

Impairment of the enjoyment of their property was the basis of plaintiffs' claim for damages in addition to the cost of repainting their house. Sulphureted hydrogen has a foul odor and the proofs on this phase of the case related to plaintiffs' personal discomfort from the atmosphere contaminated with the gas. As to this element of damage it has been said that it is impossible to lay down any rule to guide a jury in their estimate of such damages, but that "they are like unto the damages which the law allows for the pain and suffering from personal injury caused by negligence;

wholly within the sound discretion of the jury":
*Gavigan v. Refining Co.,* 186 Pa. 604, 614, 40 A. 834.
The trial judge properly instructed the jury as to the
measure of damages on this phase of the case.

The verdict is not excessive and we cannot say that
it is inadequate under the circumstances as found by
the jury.

Judgment affirmed.