## Evans *v.* Moffat et al., Appellants.

206

Argued March 7, 1960.   Before RHODES, P. J., WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONTGOMERY, JJ. (GUNTHER, J., absent).

*Edward W. Mullinix*, with him *James W. Scanlon, Matthew D. Mackie, J. Hayden Oliver, Bernard G. Segal, William A. Schnader*, and *Schnader, Harrison, Segal & Lewis*, for appellants.

*Raymond T. Law*, with him *John R. Lenahan*, for appellees.

OPINION BY ERVIN, J., May 4, 1960:

The plaintiffs in these 25 cases sought damages for injury to their respective homes caused by noxious and foul smelling gases emanating from mine refuse dumps created and maintained by Moffat Coal Company, a co-partnership (hereinafter called "Moffat"), in the vicinity of plaintiffs' properties. The cases were consolidated for trial in the court below, which sat without a jury under an express agreement of submission by counsel, in accordance with the provisions of the Act of April 22, 1874, P. L. 109, as amended, 12 PS §688 et seq. A companion case, *Waschak v. Moffat,* had been tried earlier before a judge and jury and had resulted in a verdict for plaintiffs. Moffat appealed and we unanimously affirmed, see *Waschak v. Moffat,* 173 Pa. Superior Ct. 209, 96 A. 2d 163. The Supreme Court reversed and entered judgment n.o.v. for Moffat, see *Waschak v. Moffat,* 379 Pa. 441, 109 A. 2d 310. At that time these 25 cases were pending in the court below and when the Supreme Court clarified the law, the plaintiffs filed amended requests for findings of fact and conclusions of law in accordance with the new rule of liability as contained in §822 of the Restatement, Torts, which the Supreme Court had adopted. The *Waschak* case had been tried in the court below on the theory of absolute liability. The Supreme Court, however, held that §822 of the Restatement, Torts, was applicable and it then found that the invasion was not intentional nor unreasonable. The defendant in the present cases then filed amended answers to the complaints raising the affirmative defense of res judicata on the basis of the *Waschak* decision. The testimony in the *Waschak* case was by pre-trial agreement and order admitted into evidence in the present cases as testimony on the question of defendant's liability. In addition to this, the trial court took 295 pages of oral testimony of the plaintiffs and their witnesses. The

trial court made findings of fact from the evidence, all of which supported liability, and then held that the Supreme Court's opinion in the *Waschak* case required it to enter judgment for Moffat on the ground that the Supreme Court had said that the gas invasion of plaintiffs' properties, even if intentional, was not unreasonable. Counsel for Moffat, on the 23rd day following the judgment nisi, filed a praecipe with the prothonotary for judgment for failure to file exceptions within 20 days. The court below, on plaintiffs' petition, then opened the judgments and permitted the filing of plaintiffs' exceptions to the earlier entry of judgment nisi for Moffat. Moffat then appealed this action of the court below in these 25 cases to the Supreme Court, see *Evans v. Moffat,* 388 Pa. 559, 131 A. 2d 141. The Supreme Court held that the judgment was properly opened. In that appeal Moffat's counsel argued that it would be useless to remand the case for further proceedings because the *Waschak* decision made such action futile. In the opinion written by Chief Justice JONES this argument was answered, at pages 565, 566, in the following language: "So much would suffice for answer to what these appeals brought up for review except for the appellants' argument that the decision in Waschak v. Moffat, supra, rules these cases and that it would therefore be a futile gesture to proceed further with them. Since appellants have vigorously pressed this contention—devoting to it the greater part of their brief in this court—it becomes necessary that we treat with it lest an incorrect inference should be drawn were we to pass over it in silence.

"The decision in the Waschak case is by no means res judicata of the issues in the cases now before us. At least one, if not more, of the requisites of the doctrine is absent. Specifically, there is a patent want of identity of parties plaintiff in the Waschak and other cases. . . .

"So far as the decision in the Waschak case has any bearing on the instant actions, it is at most stare decisis as to the applicability of §822(d) of the Restatement, Torts. It does not constitute an adjudication of the facts at issue which, in each case, are for the court below, as the fact-finder, to resolve as well as determine preliminarily what are matters of fact as distinguished from matters of law."

Upon the return of the cases to the court below, it made further findings that the invasion was unreasonable as well as intentional and found verdicts for the plaintiffs, which were reduced to the total amount of $58,700.00, and final judgments were entered thereon. These appeals then followed.

The law has been clearly defined by our Supreme Court for the trial of these cases. In the *Waschak* case that Court decided that §822 of the Restatement, Torts, is applicable. This section makes material the question of whether the invasion is intentional. Section 822, Restatement, Torts, is as follows: "General Rule. The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if,

"(a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and

"(b) the invasion is substantial; and

"(c) the actor's conduct is a legal cause of the invasion; and

"(d) the invasion is either

(i) intentional and unreasonable; or

(ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct."

In the *Waschak* case the Supreme Court did not apply the definition of "intentional" as found in §825, Restatement, Torts. In a later case, *Burr v. Adam Eidemiller, Inc.*, 386 Pa. 416, 422, 126 A. 2d 403, that

Court did adopt the Restatement definition set forth in §825, which divides intentional invasion into two classes: "(a) where the actor acts for the purpose of causing it; or (b) where the actor knows that it is resulting or is substantially certain to result from his conduct." It is with (b) that we are here concerned. It is, therefore, clear that in trespass for nuisance the Restatement, Torts, §§822 and 825, are to be applied. The trial judge's findings of fact, supported by testimony and sustained by the court in banc, have the force and effect of a jury's verdict and will not be disturbed on appeal: *Reilly v. Magee*, 272 Pa. 406, 116 A. 310; *Allegheny By-Product Coke Co. v. J. H. Hillman and Sons Co.*, 275 Pa. 191, 118 A. 900; *Fidelity Title and Trust Co. v. Garrett*, 327 Pa. 305, 194 A. 398; *Arnstein v. Metropolitan Life Ins. Co.*, 329 Pa. 158, 196 A. 491; *Croft v. Malli*, 378 Pa. 6, 7, 8, 105 A. 2d 372; *Scott-Smith Cadillac Co., Inc. v. Rajeski*, 166 Pa. Superior Ct. 116, 70 A. 2d 454; *Schlein v. Gross*, 186 Pa. Superior Ct. 618, 142 A. 2d 329.

The only real question in these cases is whether the trial court's findings are supported by the evidence. Finding No. 53 of the court below is as follows: "The invasion of the plaintiffs' interests was intentional in that the defendants knew the invasion was resulting and was substantially certain to result from their conduct, and yet persisted in such conduct by establishing new refuse dumps in residential locations." This finding was preceded by detailed findings which showed that when the original lessee entered the property under the 1937 lease, there was in existence a breaker refuse bank resulting from previous operations of the Glen Alden Coal Co. adjacent to the breaker; that this bank was burning then but there is no evidence that it had caused damage or pollution of the atmosphere; that the lessee started a refuse dump adjoining the burning bank and that this new dump, called the Main

Street dump, is 1,100 feet in length, 650 feet in width and approximately 40 feet in height and that this dump started to burn in 1944 and was burning at the trial; that when the Main Street dump took fire, dumping operations were transferred to a location on Washington Street at the westerly end of Church Street and in the rear of Union Street, which dump, called the Washington Street bank, is 800 feet in length along the court in the rear of Union Street, 750 feet in width along Washington Street, and 50 feet in height and that this dump is located in a built-up, populous section of the Borough of Taylor, Washington Street, Church Street and Union Street being occupied by homes; that in June 1948 the Washington Street dump was oxidizing and giving off hydrogen sulphide fumes, the odors being prevalent several blocks from the dump; that in the fall of 1948, while the Washington Street bank was giving off its hydrogen sulphide fumes in quantity and the disagreeable odors were noticeable for several blocks, Moffat built a silt dam in the rear of the McKinley Public School on North Main Street and used this refuse and a covering of dirt for the walls of the silt dam, this location also being in a residential section of Taylor; the dam measured 100 to 500 feet in width and 400 to 700 feet in length, the walls being 25 feet in height; that in 1949 when Moffat was convinced there was fire in the Washington Street bank, Moffat ceased using breaker material in the construction of the silt dam; that the walls of the silt dam also oxidized soon after its construction and gave off hydrogen sulphide fumes in quantity; that complaint was made by the burgess of Taylor to Moffat and they then began to cover the Washington Street bank with dirt but the fumes continued; that Moffat on March 9, 1949 transferred its dumping operations to Fourth Street in Taylor, Fourth Street being a continuation of Washington Street and being in a residential section

of the borough; that in May or June 1951 the Fourth
Street dump was burning, this dump being 500 feet in
length, 500 feet in width and 40 feet in height, with a
ramp 350 feet long and 300 feet wide, made of the same
refuse material, no dirt covering having been put on
this dump and the fumes given off by it in quantity
being sulphur dioxide; that when the Fourth Street
dump was burning and could no longer be used, Moffat
transferred its dumping operations to a new site be-
tween this dump and the Washington Street bank, and
are now using that location in the same general neigh-
borhood; that all of these dumps generate and give off
noxious fumes, gases and vapors identified as hydro-
gen sulphide, sulphur dioxide and carbon monoxide,
which permeate and pollute the air in the Borough of
Taylor; that hydrogen sulphide has been released from
the Washington Street bank and the silt dam; that the
generation and giving off of hydrogen sulphide, sulphur
dioxide and carbon monoxide has existed continuously
since the latter part of 1947 or at least as early as June
1948; that when a dump burns as the Fourth Street
dump is burning, the sulphur in the dump is converted
to sulphur dioxide; that sulphur dioxide in the pres-
ence of moisture forms first sulphurous acid, which is
a bleaching agent, later it is oxidized to form sulphuric
acid, which is a very strong acid; that sulphur dioxide
is more than twice as heavy as air and when the hu-
midity is high it forms small droplets in the air of
sulphurous acid and with the wind in the right direc-
tion this acid-laden air descends on the Borough of
Taylor; that sulphur dioxide is a very poisonous gas
formerly commonly used in fumigation to kill rats and
that it has a choking effect and produces coughing;
that hydrogen sulphide is a very odoriferous gas with
the characteristic odor of rotten eggs and that it is
a very poisonous gas which in high concentrations is
almost instantly fatal and that lower concentrations

cause chronic poisoning and continuous exposure to very low concentrations causes malaise, nausea, headaches and, in some cases, shortness of breath; that the generation of these two gases from Moffat's dumps in Taylor is continuous and that the sources of pollution are active and are near to the homes of the people and particularly to these plaintiffs; that the gases permeate the entire borough and their concentrations vary with atmospheric conditions and are affected by the movement of the surrounding air and the presence or absence of fog, moisture, wind and rain; that when the air is still the concentrations become greater since the sources of pollution are active and near the homes; that the hydrogen sulphide in the atmosphere in Taylor reacts with the basic lead carbonate in the paint on the plaintiffs' homes, forming lead sulphide, a dark gray or black metallic substance, and the chalking and decorative qualities of the paint are destroyed; that hydrogen sulphide not only discolors the plaintiffs' homes but tarnishes their silverware and hardware, gets into their clothing and bedclothing, and tarnishes and stains their bathroom fixtures, and causes considerably more household work for the women of the households; that the gases permeate the plaintiffs' houses, causing the occupants to experience headaches, nausea and irritation of the nasal passages and that this condition interferes with the sleep of the plaintiffs and the members of their households, and very materially diminishes the usefulness of their homes as places in which to live and in which to entertain their friends and relatives; that Moffat knew or should have known when constructing the Washington Street bank that it could oxidize, ignite and give off products of combustion of the component materials in the bank; that Moffat knew or should have known when constructing the silt dam with the same discarded breaker material that the walls of the dam could oxidize, ignite

and give off products of combustion of the component materials in the dam; that Moffat knew or should have known when constructing the Fourth Street dump with discarded breaker materials that it could oxidize, ignite and give off products of combustion of the component materials in the dump; that Moffat knew or should have known of the nature of the products of oxidization or combustion of the materials in the various banks, dams and dumps, of the harmful effects to property and persons and of the high probability of the circulation of such products by atmospheric means and that as a coal operator of experience, Moffat could be expected to know the familiar history of burning culm banks in the anthracite industry and had available the technical services and personnel to obtain such knowledge; that in selecting the sites for the deposit of breaker refuse Moffat gave no consideration to the probable effect on the plaintiffs of accumulating the refuse at the sites selected; that the air pollution in Taylor will continue indefinitely since these dumps will burn for years; that the injury to plaintiffs' real estate caused by the air pollution is permanent; and that the dumps created in Taylor by Moffat are composed of refuse from the cleaning of coal originating not only in Taylor but in other parts of Lackawanna County remote from Taylor.

We have checked these findings as to intention against the record and believe that they are supported by credible evidence. Agnes Waschak testified that when she bought her property on Main Street in June 1948, Moffat had not constructed the silt dam and at that time the Washington Street dump was giving off fumes. Six months later the fumes were prevalent at her home. The silt dam was also in a residential section and it too gave off the noxious fumes. Henry Ott noticed the fumes early in 1947.

Furthermore, after the Washington Street dump and the silt dam were giving off their gases, Moffat transferred its dumping operations to Fourth Street, also a residential section. This dump burned and gave off sulphur dioxide, a more dangerous gas than the offensive hydrogen sulphide released by the other dumps. Moffat now argues that it shouldn't be charged with notice that this dump would give off gas, because actually it gave off a different and more deadly gas than its other residential area dumps! They gave off hydrogen sulphide, but on the Fourth Street dump the hydrogen sulphide ignited and the result was sulphur dioxide, and Moffat seeks to avoid responsibility because of this.

Lower concentrations of hydrogen sulphide gas cause chronic poisoning, and continuous exposure to very low concentrations causes malaise, nausea and headaches. In some cases it causes shortness of breath. It has the odor of rotten eggs. This gas is generated by Moffat's Main Street dump, the Washington Street dump and the walls of the silt dam on North Main Street. The plaintiffs are unable to keep their windows or doors open even in summer, day or night, because of the presence of this gas in the atmosphere. It interferes with their sleep and necessitates apologies to visitors in their homes because of its offensive and disgusting odor. It blackens the paint on their homes.

After Moffat's Washington Street dump and silt dam on North Main Street were giving off their obnoxious hydrogen sulphide fumes, Moffat on March 9, 1949 transferred its dumping operations to a new location on Fourth Street, also in a residential neighborhood. Admittedly this dump burned and gave off sulphur dioxide fumes but Moffat argues that there is no evidence that the sulphur dioxide gases caused any damage.

Sulphur dioxide in the presence of moisture forms first sulphurous acid. Later it is oxidized further to form sulphuric acid and, depending on wind direction and humidity, these droplets of sulphuric acid descend on the people of Taylor. The defendant's witness, Dr. William Pearce, testified that this gas when mixed with moisture in the atmosphere would cause a peeling off of paint on property. Many of the 25 plaintiffs in the consolidated cases have testified to the paint peeling on their houses and many of them testified not only as to the obnoxious odor of rotten eggs, which is the hydrogen sulphide odor, but also to the sulphur odor which is the sulphur dioxide odor, and testified it irritated their throats and made them cough, and these are the effects of sulphur dioxide. Moffat's argument, therefore, that this extremely dangerous gas, sulphur dioxide, did not cause any harm is entirely without foundation. There was evidence that the Fourth Street dump was giving off this highly destructive and dangerous gas in quantity and, according to wind direction and humidity, the people in Taylor were breathing air containing sulphuric acid. This was the dump Moffat established in a residential section in March, 1949, when all the other dumps were giving off their foul hydrogen sulphide gas.

Samples of the testimony given in the *Waschak* case are as follows:

*Burton Watkins,* lumber dealer, lives in Clarks Summit but has a place of business in Taylor: The odor is continuous, very strong; he carries the odors home on his clothes; it makes him light headed, he has gone home evenings feeling a little "punch drunk."

*Otto John Zang,* Taylor druggist: The odor is heavy, smells like rotten eggs, is usually at its worst night and morning, is worse in damp weather, and is all over the town; makes him sick to the stomach and give a

persistent headache, hard to relieve; wakes him up at night; and he is obliged to keep windows closed summer and winter to keep the odor out.

*Clyde Hendershot,* Taylor burgess, testified that the odor is prevalent day and night, at times; for a period of a couple of years was present both day and night and now comes periodically; that when it was at its height his wife couldn't sleep at night and had to get up and sit in a chair; that there were public protest meetings which he as burgess attended; the odors are the same at the dump as at his home but stronger at the dump.

*Gretchen Houser,* school teacher, testified that she observed the odor for about two years; on rainy days it was much worse, at all times like rotten eggs; at night it is usually worse and frequently they have to get up and close the windows and sleep in an airtight room, even in summer; the odors gave her a headache "when it is particularly bad on a rainy day or a foggy day or if the wind is just in the right direction to point it at me. I cough and have a terrible headache, and morning after morning I get awake with a headache."

*Rev. G. Wesley Pippen,* Taylor minister, testified that he noticed the odor around the center section of Taylor; it is stronger late in the evening, and at night, and in the early morning, in winter rather than summer, also on rainy or humid days; he lives three-fourths of a mile from the silt dam and gets the odors at his home; it is a very obnoxious odor and his wife has complained of headaches from it.

*Theresa Waschak* testified: The odor is present almost every night and some nights it is worse than others; some nights she has to sit up in bed to catch her breath, and at times get out of bed and walk around to catch her breath, and in the morning she has a headache and nauseated feelings; keeps windows closed at

all times because of the odor; noticed the odor the morning of the trial; and the previous evening had a headache from it.

*Rev. Stephen Waschak* testified: He had visited his family home intending to recuperate from a heart attack, but stayed less than a month, and when the sulphur odor was present he had a heavy feeling in the chest and a rasping condition in the throat.

*Agnes Waschak* testified: The odor is unbearable, is constant, is bad in the fall and worse in winter; she can't open the windows or leave doors open because of the sulphur smell; her sister complains of headaches and can't sleep at night, and when company comes to her home she has to apologize because of the odors; her house has been blackened on three sides, the same condition exists on other homes in Taylor; the bathtub became discolored, the silverware tarnished.

In addition to the foregoing there is the testimony of the 25 plaintiffs describing the gases and their foul odors, their prevalence, the choking and irritating effect they have on the throat, the interference with sleep they cause, how they produce headaches and cause nausea and general discomfort, nuisance and annoyance.

No. 57 of the court's findings is as follows: "The defendants Moffats' repeated selection of residential sites for refuse dumps in close proximity to plaintiffs' properties and the homes, churches and schools of the Borough of Taylor and the harm caused thereby was unreasonable in that the utility of the actors' conduct was outweighed by the gravity of the harm." Certain other findings were also made by the court to support basic finding No. 57. These, in short, were that the use the plaintiffs were making of the properties as homes was well suited to the locality; that the selection of residential neighorhoods for refuse dumps was un-

suited to the character of the locality; that the harm complained of by the plaintiffs could have been avoided by the defendant without undue hardship or expense by selecting dumping sites more remote from residential neighborhoods; that the defendant has offered no evidence to show that such dumping sites were not available to it; that the evidence shows the defendant gave no consideration to the harmful effects its conduct would cause to the properties of the plaintiffs; that the substantial pollution of the air in residential neighborhoods with noxious and offensive gases resulted not only in damaging the physical properties themselves but largely destroyed their usefulness as homes and constitutes a serious hazard to the health and welfare of the plaintiffs.

In finding of fact No. 53 the court below used the rule of the Restatement, Torts, §825, in determining that the invasion of plaintiffs' interest in the use and enjoyment of their land was intentional. In finding of fact No. 57 that the invasion was unreasonable, the court below used §826 of the Restatement, Torts, which states the principle that "An intentional invasion of another's interest in the use and enjoyment of land is unreasonable under the rule stated in §822, unless the utility of the actor's conduct outweighs the gravity of the harm." Section 827 states a series of factors to be considered in determining the gravity of the harm. Section 828 states a series of factors involved in determining the utility of the conduct which causes the intentional invasion and §830 indicates that such an intentional invasion is unreasonable when the harm is substantial and it would be practicable for the actor to avoid the harm in whole or in part without undue hardship. As President Judge HOBAN of the court below so well said: "There can be little question of the grave nature of the harm to this plaintiff and to the other 24 plaintiffs in the companion cases, since all the

factors exist as noted in Section 827 with reference to the extent of the harm, the character of the harm involved, the social value which the law attaches to home ownership and occupancy, the suitability of plaintiff's home ownership to the character of the locality and the impossibility of plaintiff doing anything to protect her property from the threatened harm. The real problem is whether the utility of Moffat's conduct outweighs the gravity of the harm done to these plaintiffs."

Prior to 1947, although there had been fires in dumps located in Taylor which were burning for years, there was no offensive invasion of the plaintiffs' land until the defendant began placing its series of dumps in a locality close to the plaintiffs' homes. The defendant had the right to use any available land of Glen Alden Coal Company for the purpose of dumps and there was such land available at locations sufficiently distant from the home areas so that the probability of damages by noxious fumes to such homes would be greatly reduced or perhaps eliminated. There is no evidence that the establishment of dumps at such points other than in close proximity to the breaker would have resulted in prohibitive expense and hardship to Moffat. They were using trucks to carry the refuse from the breaker to the dump in most of these instances and it would have cost little more to carry the loads a little more distant. Of course, it would have been an economic advantage to Moffat to have the dumps as close as possible to the breaker, but mere economic advantage offers no excuse for causing substantial harm to another's property if such harm can be avoided by proper measures. See Comment on Clause (c) of §828, Restatement, Torts. The court below concluded that the invasion of plaintiffs' interest in the use and enjoyment of their own land was unreasonable as well as intentional. With that conclusion we agree.

The appellant also argues that there is no evidence of the cost of repainting the houses and that the plaintiffs have not shown that the cost of restoring their homes is less than the loss in market value. The real damage complained of in these cases is the pollution of the air surrounding the houses, not the effect of the poisonous gases on the paint. Painting the houses will not restore the purity of the air surrounding them. The paint damage is trivial compared to the real damage, i.e., loss in value caused by the foul stench, and the properties cannot be restored by painting. The court below followed the correct measure of damages as set forth in *Milan v. Bethlehem,* 372 Pa. 598, 94 A. 2d 774, wherein the court said, at page 608, " 'This court has taken occasion to review the authorities in several recent cases, and as a result it must be accepted as finally settled in this jurisdiction that where the injury to real estate is permanent, the measure of damages is the difference in market value, before and after the injury, or the cost of removing the obstruction, whichever is the lower amount'. . . ." To restore these properties would require the removal of the culm banks and then the repainting of the houses. It is of course absurd to suppose that the plaintiffs would be required to show the cost of such procedure. The court below found that the injury was permanent and therefore the correct measure of damage was the difference in value before and after.

The court below also allowed $5,700.00 total damages, in addition to the market value loss, for annoyance and discomfort. This was in conformity with Restatement, Torts, §929. The additional award was for the personal annoyance and discomfort the plaintiffs suffered—not merely loss of use and enjoyment. The evidence supports such award for personal damages in addition to physical property damage. The plaintiffs suffered nausea and headache and they were required

to perform more housework and suffered irritation of the nose and throat membranes as a result of the gases.

We are convinced that there was sufficient evidence to support the findings and conclusions made by the court below and we believe that the law was properly applied to those findings and that judgments were properly entered for the plaintiffs.

Judgments affirmed.

---

DISSENTING OPINION BY WOODSIDE, J.:

I dissent on the ground that the Supreme Court has held as a matter of law that the identical evidence of liability presented in this case was insufficient to support a finding against the defendants, and that the case so holding has not been reversed.

In 1951 twenty-six cases were brought against Robert Y. Moffat et al. in which all of the plaintiffs claimed damages for injuries to their respective homes allegedly caused by noxious gas emanating from the mine refuse dumps maintained by the defendants.

One of the actions, *Waschak v. Moffat,* was used as a test case. It was tried before a jury which found for the plaintiffs. After the usual motions by the defendants were refused by a court en banc, a money judgment was entered by the court below against the defendants. This Court affirmed, but the Supreme Court reversed and entered judgment n.o.v. for the defendants. 173 Pa. Superior Ct. 209, 96 A. 2d 163 (1953); 379 Pa. 441, 109 A. 2d 310 (1954). The Supreme Court noted that "Twenty-five other cases are at issue awaiting the decision in this case."

The entry of judgment n.o.v., as I understand it, was a determination by the Supreme Court that the evidence was insufficient to support a verdict for the plaintiff. The Court certainly realized it had no authority

to "find" the facts. The question before the Court, it decided and said, was "one of law."

The Supreme Court decided that the case was not one of absolute nuisance. It decided that under the evidence "the invasion of plaintiffs' land was clearly not intentional," and that there was no invasion of the plaintiffs' rights by the defendants which could be held unreasonable in a mining community.[1]

Prior to the disposition of *Waschak v. Moffat* on appeal, it had been agreed that the other twenty-five cases, which are the subject of this appeal, would be tried by the court without a jury, and the issue of liability would be determined *upon the basis of the evidence in the Waschak case.*

The defendants' liability having been passed upon in the test case by the entry of judgment n.o.v. by the Supreme Court on the basis of this evidence, one would think that the question of the defendants' liability was settled, and the law which would govern the remaining cases was firmly established. Not so.

After the Supreme Court reversed this Court in the *Waschak* case, the defendants in the companion twenty-five cases pleaded res judicata which the court below sustained in nisi orders. Twenty-three days later the defendants took judgments believing that Pa. R. C. P. 1048 gave them the right to do so after 20 days. Upon motion of the plaintiffs, the court below opened the judgments on the ground that the plaintiffs had 30 days to take exceptions under the Act of April 22, 1874, P. L. 109, as amended, 12 PS §688 et seq. The defendants appealed these cases to the Su-

---

[1] The opinion has been widely recognized and favorably commented upon. See 1956-1957 Survey of Pennsylvania Law, 19 U. Pitt. L. Rev. 184, 388 (1958) ; 1955 Annual Survey of American Law, 31 N.Y.U.L. Rev. 344, 359 (1956) ; Annot., 54 A.L.R. 2d 764 (1957). Note 16 U. Pitt. L. Rev. 384, 391 (1955).

preme Court. *Evans v. Moffat,* 388 Pa. 559, 131 A. 2d 141 (1957). All that those appeals brought up for review, said the Supreme Court, was the action of the court below in opening judgments in favor of the defendants and permitting the plaintiffs to file exceptions to the trial court's findings, conclusions and judgments nisi. p. 561. The Supreme Court affirmed the opening of the judgments and decided that the *Waschak* decision was not res judicata of any issue in the present cases since the party plaintiffs were not the same. It did not overrule the *Waschak* decision, nor did it say that the doctrine of stare decisis did not apply.

The trial judge and court below then examined the identical evidence passed upon in the *Waschak* case, and found *against* the same defendants for the same acts for which the Supreme Court held the jury could *not* find the defendants liable. These appeals were then taken by the defendants from the judgments entered against them by the court below.

It is difficult for me to imagine a situation that calls more clearly for the application of the doctrine of stare decisis than is here presented.

The doctrine of stare decisis, which prevails in Pennsylvania, declares that for the sake of certainty a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same. *Heisler v. Thomas Colliery Co.,* 274 Pa. 448, 118 A. 394 (1922); *Burtt Will,* 353 Pa. 217, 231, 44 A. 2d 670 (1945). No matter how many words might be used in an effort to picture it otherwise, the simple truth is that the evidence, which the Supreme Court held insufficient to hold the defendants liable, was held by the court below to be sufficient to hold the defendants liable.

In as much as the Supreme Court did not overrule the *Waschak* decision, the court below and this Court

are bound by it. Neither this Court nor the court below has the power to say that stare decisis is to be abandoned as a principle in Pennsylvania, or that it is not to be applied to these cases.

Of course, the Supreme Court has the power to overrule its decisions, but it is not for this Court to assume that it will exercise this power in any particular case. The majority of our Court may have reason to expect, from what was said in *Evans v. Moffat,* supra, that the Supreme Court may overrule the *Waschak* decision, but we should not change the law upon the assumption that the Supreme Court intends to reverse itself.

The procedure followed in these cases creates disrespect for the administration of the law. We have here an anomalous situation: Waschak and twenty-five other plaintiffs, injured by the same acts of the defendants, bring identical actions at the same time, and offer the same evidence of the defendants' liability, on the basis of which the fact finders found against the defendants in *all* cases. In 1954 the Supreme Court decided that the defendants are not liable to Waschak. In 1960 the Superior Court decides that the defendants are liable to the other twenty-five.

We should strive to settle law, not unsettle it. Otherwise, as stated by the late Mr. Justice OWEN J. ROBERTS, "law becomes not a chart to govern conduct but a game of chance . . . Counsel and parties will bring and prosecute actions in the teeth of the decisions that such actions are not maintainable on the not improbable chance that the asserted rule will be thrown overboard. Defendants will not know whether to litigate or to settle for they will have no assurance that a declared rule will be followed." Dissent in *Mahnich v. Southern S. S. Co.,* 321 U.S. 96, 112-113 (1944).

The judicial system was established to determine facts and apply the law to them. The facts in these

cases are beyond serious dispute, and yet after nine years the judicial system of this Commonwealth is still struggling with the simple question: Are the defendants liable for their acts? In all walks of life, people determine facts and act upon them—*promptly and irrevocably*. These people lose respect for a judicial system which for nine years considers and reconsiders but does not settle.

If there is to be no finality in the courts' decisions —if the principle of stare decisis is to have no standing in this Commonwealth,—then litigation will mount, uncertainty will rule, and delays will multiply. And with them will grow disrespect for the judiciary.

As I view it, the principles governing the cases now before us were settled by the Supreme Court in 1954.

I would reverse.

WATKINS, J., joins in this dissent.