**Provenza v. Wilson Specialties, Inc.**

*Anthony P. Picadio*, for plaintiffs.
*Gilbert E. Marcraft*, for defendant.

DOYLE, J., September 11, 1972.—

### FINDINGS OF FACT

After hearing on June 5 and 6, 1972, we find that some time during 1959 plaintiffs purchased the lot and dwelling house located at 309 Pennsylvania Avenue, Borough of Oakmont (Oakmont), Allegheny

County, Pa., and have occupied the same since that time. The corporate defendant (Wilson) at that time, and for at least 15 years prior thereto, owned and operated a mill at 709 Cedar Way, adjoining plaintiffs' land, for manufacturing wood products, in the course of which business it operated electrically-powered saws and other wood cutting machines. Both plaintiffs' and defendant Wilson's lands are located within a district which is zoned "industrial" by the borough as set forth in zoning ordinances of 1949 and 1952 which were received in evidence. In 1966, new managers assumed control of Wilson and installed additional electrically powered equipment for cutting wood. A sawdust and woodchip collector was installed at about the same time but much sawdust and many wood chips had previously fallen onto plaintiffs' rear lawn and even infiltrated plaintiffs' dwelling house.

After exchanges of vulgarities between one of the plaintiffs and one or both of the individual defendants, and subsequent to various other actions which merely exacerbated an already abrasive relationship between the litigants, plaintiffs complained to the borough, the County Health Department, various justices of the peace and finally to the court in the instant litigation which was commenced on July 30, 1971.

At a pretrial conference on February 25, 1972, counsel for the parties stipulated in a filed writing that the sawdust emission problem had been solved except for small amounts emitted during loading operations, which matter has since been rectified and is not now an issue. The only matters requiring decision are whether: (1) Defendants should be required to minimize noises caused by electric motors which operate the dust collector and the fan on a cyclone blower; (2) plaintiffs should be awarded compensatory damages

for the cost of medical treatment, pain, suffering and inconvenience, and injury to their real and personal property; (3) plaintiffs should be awarded exemplary damages.

At trial, all parties admitted, which was confirmed by the uncontradicted testimony of defendants' engineer expert Vlastmir Djordjevic, that defendants' plant has been sealed since December of 1970 and that no sawdust or wood chips are emitted from the plant and that Wilson is operating within the "Rules and Regulations of the Allegheny County Department of Health, Article XVII, Air Pollution Control" issued on January 1, 1970.

Plaintiffs admit that the sawdust and wood chips inflicted no *permanent* damage to their land, dwelling house and personal property but assert that they were greatly inconvenienced by said emissions; operation of their lawn mower was more difficult, a children's portable swimming pool could not be used at all times during the summer months, plaintiffs had to close most of the windows in their house, roof gutters were partially plugged and personal clothing could not be hung outside to dry.

The testimony disclosed that Wilson, during all of the time complained of by defendants, was installing expensive equipment to alleviate the conditions complained of, after engaging engineering talent to test and design such equipment. It is uncontradicted that Wilson has spent $133,498.82 to improve the plant which employs 19 production workers.

Weighed on the scale requiring us to balance equities, plaintiffs' damages from sawdust emissions are subject to the rule de minimis non curat lex and are not recoverable, even if some criteria had been entered on the record to guide the trier of fact.

At argument after testimony had been concluded,

plaintiffs' counsel suggested that $50 per day from 1966 to 1971 would be an appropriate amount of damages and he impliedly waived any right to exemplary damages. But there exists no record support for the award of any damages. Neither a jury nor a chancellor in equity may speculate on money damages.

No physicians testified as to asserted medical damages. Even were we to consider their reports filed with plaintiffs' pretrial statements, those reports do not contain the quality of testimony necessary to sustain an award of money damages. The report of Dr. Joseph A. Zahorchak states that minor plaintiff Mary Ann's allergy is "probably made worse by the sawdust"; Dr. Bruce B. MacMillan states that he "cannot say in all honesty that minor plaintiff Matthew's . . . was a problem of sawdust allergy"; and as to Mary Ann, Dr. MacMillan states "For me to say, however, that the sawdust was specifically capable, in this instance, of causing all or some of the symptoms would be conjecture." That type of "testimony" will not sustain an award of damages.

The assertion that exemplary damages should be awarded is without merit and was not pressed by counsel at posttrial argument.

## REMAINING ISSUE

Thus, there remains for resolution only the issue: Should defendant Wilson be required to shield motors on a dust collector and a cyclone blower to minimize *noise* emissions?

Kenneth C. Lawson, an electrical engineer, testified regarding sound levels and sound frequencies and opined that equipment was available to "dampen" noise created by wood chips striking plates on the collecting bin and that he believes the noise from the power saws could be reduced by installing special saws

with "damping" devices. On cross-examination, he admitted he had never been on defendants' premises and was not sure how the sound levels compared with noises emitted by passenger busses, railroad locomotives, highway trucks, fire engines or drop forges (all used at nearby locations) and that he did not know the cost of installing "damping" devices.

Wife-plaintiff testified that the plant operation, approximately eight hours per day, was exceedingly noisy and that she could hear the noise even when her house was entirely closed. The individual defendants who manage the plant and occupy offices within it were not disturbed by noise from its operation; nor was John H. McMahon, for seven years manager of the nearby Oakmont Water Authority facility, offended by the noise or other noise produced by a metal stamping mill which uses saws and presses in this "industrial" zoned area.

## DISCUSSION

Plaintiffs cite the following cases in support of their position:

Gavigan v. Atlantic Refining Co., 186 Pa. 604 (1898), a trespass action for damages caused by oil seeping from defendant's plant onto plaintiff's land, allowed damages but the activity was held not to be a nuisance. Defendant's plant was constructed after plaintiffs had purchased their dwelling house. The case is not apposite to the present noise-emission complaint.

Farver v. American Car & Foundry Co., 24 Pa., Superior Ct. 579 (1904), allowed damages in a trespass action where smoke, gas and sulphurous fumes caused discomfort to nearby dwelling house occupants. But, as in Gavigan, supra, no noise emission was involved.

McCune v. Pittsburgh & Baltimore Coal Co., 238

Pa. 83 (1913), involved stream pollution by acid mine drainage and is inapposite here.

McClafferty v. Beckmann Bros., 80 Pitts. L. J. 455 (1932), allowed damages in a trespass action where the operation of a coal yard created vibrations which cracked plaster in plaintiff's dwelling house. No such matter is involved in the instant case, as refined by the stipulation.

Waschak v. Moffat, 173 Pa. Superior Ct. 209 (1953), permitted damages in a trespass case where hydrogen sulphide gas emitted from a culm dump damaged the paint on plaintiff's dwelling house. Kramer v. Pittsburgh Coal Co., 341 Pa. 379 (1941), a trespass case, also allowed damages for emission of foul odors from sulfureted hydrogen gas where material annoyance, inconvenience and discomfort were shown. Neither Waschak nor Kramer involved noise emissions, the only issue involved in the instant case; although dicta in Waschak alluded to damages allowable in "noise cases" but suggested that the utility of operating an industrial plant must also be considered.

Eisenbrown v. Bowers Battery & Spark Plug Co., 48 Berks 248 (1956), involved a bill in equity to enjoin the emission of odors, fumes and chemical deposits on grounds of nuisance. The stipulation in the case at bar, however, restricts our consideration to cases involving noise emissions.

Four equity injunction cases cited by plaintiffs relate to noise: Guarina v. Bogart, 407 Pa. 307 (1962); Gardner v. Allegheny County, 382 Pa. 88 (1955); Ebur v. Alloy Metal Wire Co., 304 Pa. 177 (1931), and Quinn v. American Spiral Spring & Manufacturing Co., 293 Pa. 152 (1928).

Guarina enjoined use of large megaphone-type loud speakers in an outdoor theatre, which were held to be a nuisance, and mandated acquisition of individual

speakers for installation in each customer's vehicle; holding, however, that:

"The person who lives in the middle of a city cannot, of course, ask to be immunized from the effects of the turbulence, traffic and noises which are inevitably part of urban life, . . ."; Page 313.

Gardner involved regulations of Federal aviation authorities and airplane landing glide angles and take-off patterns in the operation of Greater Pittsburgh Airport. The case was inextricably entwined with whether the activity complained of constituted a "taking" within the meaning of Pennsylvania condemnation statutes and is not authority for any decree sought in the instant case.

Ebur related to the discharge of smoke, odors, etc., which entered plaintiff's dwelling house and to machinery which induced vibrations and caused pots, pans, etc., in plaintiff's house to rattle, causing offensive noise and disruption of sleep. The plant operated during normal sleeping hours, a fact absent from the case in litigation. That court stated:

"The courts have found it difficult to lay down any precise and inflexible rule by the application of which it can be determined that a plaintiff in a given case is entitled to relief by injunction against smoke, fumes and noises emitted in the vicinity of his residence. It has been said that a 'fair test as to whether a business lawful in itself, or a particular use of property, constitutes a *nuisance,* is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case': 46 C.J. 655. It has also been said: 'Whether the use is reasonable generally depends upon many and varied facts. No hard and fast rule con-

trols the subject. A use that would be reasonable under one set of facts might be unreasonable under another. What is reasonable is sometimes a question of law, and at other times, a question of fact. No one particular fact is conclusive, but the inference is to be drawn from all the facts proved whether the controlling fact exists that the use is unreasonable': 46 C.J. 656. No word is used more frequently in discussing cases of this kind than the word 'reasonable,' and no word is less susceptible of exact definition. What is reasonable under one set of circumstances is unreasonable under another. Custom itself has much to do with determining what is reasonable. Noises which in the preindustrial era would have been considered intolerably unreasonable are now tolerated as reasonable. The noise and smoke of railroad trains frequently passing human habitations is not now considered unreasonable, although an equal amount of noise and smoke would doubtless at an earlier time have been considered so. That a certain amount of smoke, fumes, gases and noises will necessarily be produced and emitted by manufacturing plants is inevitable, but that persons who dwell near such plants, like persons who dwell near railroads or on busy city streets, must put up with a certain amount of resulting annoyance and discomfort is self-evident. The prosperity of an industrial community depends on its industrial activities and it would be inconsistent with sound public policy to prohibit these activities at the behest of a comparatively few who are annoyed thereby. Every form of industrial activity has its disagreeable factors. Industries, like individuals, have 'the defects of their qualities.' In mining and manufacturing communities people must expect that their homes will be more difficult to keep clean than if they lived in an

agricultural community. A certain amount of noise also is inseparable from industrial activity. The burdens of prosperity must be taken with its benefits."

". . . every person dwelling in an industrial community, and particularly near industrial plants, must to some extent bear the annoyance and injury of smoke, odors, gases, smudge and noises" Page 186.

"If devices or more efficient management which would reduce the smoke, odors, gases, smudge and noises and vibrations issuing from its plant are available to the defendant at a reasonable expense, it is the duty of the defendant to secure such devices or management, and if it fails to do so, the smoke, noises, etc., emitting from its plant may be regarded as unnecessary and unreasonable": Page 187.

Quinn required defendant to arrange machinery so as to minimize injury to an adjoining resident, considering the use to which the machinery was adapted and the needs of the business. No proof was offered in the instant case that rearranging the defendants' machinery would alleviate plaintiffs' complaints. The court also held that a dweller in a manufacturing district is not entitled to the same peace and quiet as he could have if living in a strictly residential neighborhood.

Nor does the unusual situation involved in the automobile drag strip racing case (Bedminster Township v. Vargo Dragway, Inc., 434 Pa. 100 (1969), not cited by plaintiff), aid plaintiffs in this case, since that court found that the activity involved was a public nuisance in fact.

Restatement, Torts, §822 and §825, attempt to define private nuisance deliberately avoiding the use of that term, see scope note, page 215, and the application of the term to odors, fumes, gases, etc., where no trespass q.c.f. in its historical or usual modern sense,

is involved. But these sections of the restatement do not require the court to issue the injunction sought here in the circumstances described by the paucital proof of noise provided by the instant record.

Plaintiffs' proof on the issue of noise is confined testimony of the wife ". . . that the sound emitted by defendants' plant was 'excessively noisy' and was audible even when she entirely closed her house." Mr. Lawson's expert testimony, when read in light of his written expert opinion, relates to decible measurements in *residential* communities. His testimony regarding "damping" devices did not include cost data and was rendered almost meaningless in view of his admission that he never even visited the factory he seeks to have the court regulate.

This court has long and diligently sought to have reasonable rules formulated to control and abate noise, deeming assaults on the aural sense to be among the most destructive aspects of industrial civilization. But our personal views are not law: We cannot order a return to the delights of a quiet, pastoral civilization; nor enjoin all dissonance; nor mute the rude cacaphony that destroys the silence which gestates great thoughts.

The testimony adduced by plaintiffs is not legally sufficient to sustain the burden cast upon them by Ebur and cases cited. A decree consistent with this opinion will be entered.

## DECREE NISI

And now, September 11, 1972, plaintiff's complaint is dismissed at the cost of plaintiffs.