## Noerr v. Lewistown Smelting & Refining, Inc.

*Albert Houck*, for plaintiff.

*Houck & Barron, R. Lee Ziegler* and *Richard H. Wix*, for defendants.

*Siegel & Siegel*, for first additional defendants.

*Horace J. Culbert*, for second additional defendant.

LEHMAN, S. J., (Specially Presiding), January 31, 1973.—This is an action in equity for injunctive relief to restrain defendants from permitting poisonous and corrosive gases, smoke, lead particles and lead oxides to escape from their manufacturing plants into the atmosphere and to be disseminated onto plaintiff's farmlands, crops and vegetation, all to plaintiffs' irreparable injury and damage, and to recover the resulting damages suffered by plaintiffs, including damages to their farmlands, crops, domestic animals, production losses, personal annoyance, inconvenience, comfort and unlawful detention.

Defendants filed answers specifically denying all the material allegations. Sitkin Smelting and Refining, Inc., formerly known as Lewistown Smelting and Refining, Inc., one of the defendants, in its answer, admitted that it had constructed and erected a manufacturing plant which was used by it for smelting nonferrous metals and that only Sitkin Industries, Inc., and Wasco Corporation, two other defendants, conduct open burning.

The within action in equity was commenced by a summons issued July 6, 1964, and served on all defendants on July 10, 1964. Six sets of interroga-

tories were filed by plaintiffs on August 6, 1964, to which defendants filed preliminary objections. After arguments and orders of the court, answers to the interrogatories were filed on August 29, 1965. Meanwhile, on August 20, 1964, defendants ruled plaintiffs to file a complaint and, after argument and court order, plaintiffs filed and served defendants with a complaint on November 3, 1967. On February 26, 1968, an amended complaint was filed and served. Defendants filed responsive answers thereto on April 5, 1968.

Plaintiffs' amended complaint charges defendants with liability on four different theories, namely: (1) Nuisance; (2) ultrahazardous activities; (3) intentional and unreasonable invasion; (4) negligence.

In support of the charge of nuisance, plaintiffs allege that after they had purchased their farm and had begun a dairy operation thereon, two of defendants purchased two tracts of land in the same narrow valley and in close proximity to plaintiffs' farm; that defendants caused to be constructed upon said tracts of land a manufacturing plant which defendants used and continue to use for smelting and refining nonferrous metals having a lead content; that said defendants, by open burning, removed and continue to remove coverings, containers and combustible materials from large quantities of batteries, automobile radiators and nonferrous scrap metals brought to said tracts of land; that as a result of the location, manner of construction of said manufacturing plants, the methods used in the maintenance and operation of same and said scrap or junk yards, and by the fuel used, large quantities of poisonous and corrosive gases, smoke, lead particles and lead oxides were permitted to escape and be disseminated over and onto plaintiffs' farmlands and

upon the crop and vegetation grown thereon, whereby plaintiffs' farm and leased lands, beginning on or about 1959, became contaminated with a high and lethal concentration of lead and that said contamination process was of a continuous, recurrent, progressive, increasing and cumulative nature, and exists as of the time of filing said amended complaint, to wit, February 26, 1968. Plaintiffs allege that defendants were notified by them of harmful and injurious effects caused by them jointly or separately, but that defendants have neglected, failed and refused to remove or abate the nuisance and that plaintiffs have no adequate remedy at law, that irreparable injury has resulted and will continue to result unless abated.

The first alternative cause of action alleges that defendants in locating, erecting and operating said smelting plant in its peculiar location and in close proximity to plaintiffs' farmlands, constituted an ultrahazardous activity involving a risk of serious harm to plaintiffs.

The second alternative cause of action alleges that defendants and their principal officers, having been in the smelting business since 1949, were well informed of the probable harmful effects that result from smelting nonferrous metals, especially in close proximity to farms, and that defendants intentionally and unreasonably caused plaintiffs' damages which defendants knew, or should have known, or were substantially certain, would result.

The third alternative cause of action charges negligence on the part of defendants in locating their smelting plant in close proximity to the farmlands of plaintiffs and in a small, narrow agricultural valley highly unsuited to the erection and operation of smelting plants, in making an unnatural use of the land, in

failing to give due consideration to the harmful effects of the air pollution which was substantially certain to result to plaintiffs, in failing to obtain or use available technical services to avoid and prevent air pollution, in failing to take adequate precautions to prevent such harm to plaintiffs, in erecting, maintaining and operating their smelters in a negligent manner, in failing to use the most effective and approved devices for eliminating such air pollution, in negligently erecting and operating unsuitable corrective devices in said smelting plant and in failing to have due regard for the rights, safety and position of plaintiffs.

On January 2, 1968, Sitkin Smelting and Refining, Inc., issued a writ to join American Viscose Corporation and FMC Corporation as additional defendants. The writ to join and the complaint of Sitkin Smelting and Refining, Inc., were served on January 22, 1968.

The basis for liability of American Viscose Corporation and FMC Corporation, additional defendants, as alleged in the original defendant's complaint, is that said additional defendants are alone liable or severally liable with Sitkin Smelting and Refining, Inc., to plaintiffs in that said additional defendants "maintained a pool of liquid and sinkhole" on land near plaintiffs' farm and by truck transportation poured and deposited therein "various and sundry noxious contaminants injurious to the health of animals and human beings" and that if any contamination of plaintiffs' lands occurred, such was the result of truck drippings from said transportation, contamination of provender for plaintiffs' animals being hauled in said trucks, use of water by plaintiffs for irrigation from streams of water fed by overflow and seepage from said pool of liquid and sinkhole and water pollution of Jacks Creek from said pool of liquid and sinkhole, presumably

from which plaintiffs' cattle drank. Additional defendants specifically denied these averments by answer filed on July 3, 1968.

On March 6, 1968, said additional defendants issued a writ to join Lewistown Materials Company as a second additional defendant. Additional defendants' complaint as to the second additional defendant was served on July 3, 1968, and an amended complaint was served on December 5, 1968. Lewistown Materials Company filed a responsive answer specifically denying the material allegations.

Hearings were begun on November 24, 1969, and were held on various dates with plaintiffs resting their case on March 4, 1970. Thereafter, testimony was heard on behalf of original defendants. Before completing their testimony, Sitkin Smelting and Refining, Inc., one of the original defendants, on June 26, 1970, petitioned for leave to amend its complaint against American Viscose Corporation and FMC Corporation, additional defendants, alleging that FMC Corporation, formerly American Viscose Corporation, in the operation of its plant in Granville Township, Mifflin County, Pa., caused large quantities of poisonous and corrosive gases, smoke, lead particles, lead oxides and fly ash to escape and be disseminated over and onto plaintiffs' lands. Said additional defendants filed an answer to said petition to amend and, after argument and consideration of briefs, we dismissed the rule to show cause why Sitkin Smelting and Refining, Inc., should not be granted leave to amend its complaint and refused the petition to amend.

Upon the completion of testimony on the part of American Viscose Corporation and FMC Corporation, we granted a compulsory nonsuit as to Lewistown Materials Company.

## ISSUES

1. Has liability to plaintiffs been proven as to one or more of the original and additional defendants upon one or more of the following causes of action: (1) Nuisance; (2) ultrahazardous activities; (3) intentional and unreasonable invasion; (4) negligence?

2. If so, what is the proven amount of damages as to said defendant or defendants?

## FINDINGS OF FACT

1. On or about October 29, 1955, plaintiffs purchased a farm of approximately 100 acres in Derry Township, Mifflin County, Pa.

2. At the time of purchase of said farm, the surrounding area was used predominately for farming and rural residential purposes. Three or four farms in that valley were producing milk for shipment. The only industrial operations in the area at that time were limited to a potato chip factory and the dumping of industrial wastes.

3. Shortly following the purchase of said farm, plaintiffs utilized said farm for family living quarters and for dairy farming. Beginning in 1959 and continuing through 1966, plaintiffs leased additional nearby farmland.

4. By 1959, plaintiffs had 15 or 16 head of cattle on said farm and a 60 or 70-acre tract of leased farmland. Plaintiffs increased the amount of acres leased, until in 1962 it approximated 200 acres of leased farmland.

5. On or about November 6, 1956, Port Real Estate Corporation, one of the defendants, purchased approximately 10 acres of land and on said date Sitkin Holding Company, Inc., another defendant, purchased approximately 17 acres of land. The land represented by said purchases is located in Derry Township,

Mifflin County, Pa., and is in the same valley as the farmland owned and leased by plaintiffs. Said land purchased by said defendants was formerly used as a private airport.

6. In 1959, Sitkin Smelting and Refining, Inc., formerly known as Lewistown Smelting and Refining, Inc., one of the defendants, constructed a manufacturing plant on the tracts of land comprising 27 acres, referred to in the preceding paragraph, and beginning in 1959 used said manufacturing plant for the smelting of nonferrous metals, primarily brass and bronze.

7. The stacks of said manufacturing plants are approximately one and one-half miles northeast from plaintiffs' house and barn, approximately 3,000 feet east from farmland leased by plaintiffs and used in their farm operation, and approximately one and one-half miles west from other land leased by plaintiffs and used in their farm operation.

8. Both plaintiffs' and defendants' properties are located in a narrow valley with a ridge approximately 800 feet high on the north side and a mountain approximately 1,500 to 1,800 feet high on the south side, causing the winds to move up and down the valley and to create at times, especially in early mornings in the summertime, a temperature inversion whereby the air closer to the ground is colder than air at a higher level and the warmer air traps the colder air and any contaminants contained therein and acts as a lid.

9. From 1959, the date Sitkin Smelting and Refining, Inc., began its operations, until about 1967, Sitkin Smelting and Refining, Inc., knowingly and intentionally conducted its brass smelting operations without any pollution controls during which entire period of time lead particulate was emitted therefrom into the atmosphere, in spite of the fact that Lewis Sitkin, chief executive officer of Sitkin Smelting and Refining,

Inc., and an experienced smelter of metals since 1945, knew of efficient pollution control devices for smelting operations that were on the market in 1959 when the smelting operations were begun by his company on the site in Derry Township, Mifflin County, Pa.

10. Brass bronze ingots produced by said brass smelter averaged approximately three to five percent lead.

11. As of November, 1969, Sitkin Smelting and Refining, Inc., was one of the six largest smelters of brass in the United States.

12. The following shipments of brass, bronze and copper ingots were made by Sitkin Smelting and Refining, Inc.:

| In 1962 | 21,000,000 | pounds |
| In 1963 | 21,127,054 | pounds |
| In 1964 | 20,490,460 | pounds |
| In 1965 | 30,755,807 | pounds |
| In 1966 | 33,252,398 | pounds |
| In 1967 | 40,771,172 | pounds |
| In 1969 | 47,000,000 | pounds* |

13. For more than five years immediately prior to November 1969, the date of the first hearing in the within case, Sitkin Smelting and Refining, Inc., conducted its smelting operations on a 24 hour a day basis at least five days a week.

14. Sitkin Smelting and Refining, Inc., as of 1964, was utilizing three rotary oil fired furnaces to reclaim brass from scrap metal in its brass smelting operations, their capacities being 25 tons, 15 tons and 10 tons,

---

* There is no testimony as to the number of pounds of shipment of brass, bronze and copper ingots for the years 1968 and 1970, although Sitkin Smelting and Refining, Inc., was engaged in that production at that time. Testimony was concluded October 7, 1970.

respectively. Since 1964, the capacity of the brass smelting operation has increased to five furnaces, with a total capacity of 200 tons.

15. In 1961, Sitkin Smelting and Refining, Inc., purchased and installed on the aforesaid tracts of land a secondhand lead blast furnace and said purchase was made despite the fact that said smelting company's metallurgist had advised against said purchase.

16 The company from which said secondhand lead blast furnace was purchased had had fume problems with said blast furnace and this fact was known by Lewis Sitkin, chief executive officer of Sitkin Smelting and Refining, Inc., and said metallurgist, both of whom had inspected same prior to its purchase.

17. Said secondhand lead blast furnace was installed and operated by Sitkin Smelting and Refining, Inc., in a structure that had no sides but did have a roof, thereby permitting the prevailing winds to blow lead fumes directly into the atmosphere.

18. The filtering system installed for said lead blast furnace consisted of a dry filtration process and wet scrubbers. The gases were filtered through a porous media, after which a series of spray nozzles released water into the effluent before the effluent escaped by means of a stack. The stack had been fabricated by Sitkin Smelting and Refining, Inc., from 50-gallon steel drums welded together.

19. The aforesaid filtering system was inadequate to effectively collect the particulate matter and was installed and operated by persons having no technical qualifications for the design, installation and operation thereof. Sitkin Smelting and Refining, Inc., knew or should have known from the volume and coloration of the effluent from the smoke stack that said filtering system was not efficient or working properly.

20. Said filtering system broke down an average of twice a week and if the breakdown occurred at night, the operation of the lead blast furnace was intentionally continued by Sitkin Smelting and Refining, Inc., but if the breakdown occurred in the daytime, the lead blast furnace was shut down. At nighttime said company intentionally increased the heat in the lead blast furnace so as to increase production, but this resulted in more effluent.

21. A "cupola" type of smelter fabricated from steel barrels and fueled by coke and air, was installed by Sitkin Smelting and Refining, Inc., for said lead blast furnace, but this did not provide for efficient operation and it was replaced with a rotary type furnace.

22. At least two of the employes of Sitkin Smelting and Refining, Inc., who worked on said lead blast furnace suffered nausea at various times and were eventually hospitalized for lead poisoning.

23. Sitkin Smelting and Refining, Inc., failed to consult a technically qualified person on effective air pollution control as to design an operation of the filtering system for the lead smelting operations.

24. Sitkin Smelting and Refining, Inc., produced 537,964 pounds of lead ingots in 1962 from said lead smelting operations. Said lead smelting operations continued in 1963, 1964 and 1965, and sometime thereafter were discontinued.

25. The aforesaid lead smelting operation used primarily lead plates from old storage batteries. After the same were melted down, the lead was recovered and processed for various commercial purposes.

26 Beginning in 1960 and continuing until sale of the herd in 1967, plaintiffs experienced breeding problems with their herd of cattle, evidenced by inability to conceive, requiring rebreeding, and showing an

average of only 62 percent breeding from the first service against a normal 70 to 72 percent.

27. In spite of the fact that in 1959, plaintiffs' herd of cattle had a milk production slightly in excess of the average production per cow for the members of the Dairy Herd Improvement Association for Mifflin County, beginning in 1960 and continuing until sale of the herd in 1967, the milk production per cow was substantially less each year for plaintiffs' cows as compared to the average production per cow for the members of the Dairy Herd Improvement Association for Mifflin County for said years.

28. The general health condition of plaintiffs' herd was below par from 1960 to 1967, evidenced by poor body condition, repeat breeding, sterility, abortions, loss of appetite, lowered milk production and substantial increase in the cost of veterinary services.

29. In 1962, plaintiffs' cows started to lean and to push against posts and stalls and to show a lack of muscular control, evidenced by twitching, staggering, going in circles and grinding of teeth. They were nervous and unmanageable. They exhibited lameness due to inflamed joints. These are typical and classic clinical symptoms of lead poisoning. In December 1962 and January 1963, four of plaintiffs' cows died. Necropses were performed on said cows and the laboratory tests showed that they had died as a result of lead poisoning. Subsequent to 1962, all or nearly all of the cows in plaintiffs' herd suffered from lead poisoning.

30. Because of said lead poisoning, plaintiffs' herd could not properly be sold for dairy purposes.

31. The physical condition of plaintiffs' herd improved and the milk production increased when the cattle did not eat the silage grown on plaintiffs' farm, but again showed symptoms of lead poisoning after

three to five weeks of feeding on the silage grown on plaintiffs' farm.

32. After receiving the opinions of qualified veterinarians as to the existence of lead poisoning of plaintiffs' herd, Lewis Sitkin, chief executive officer of Sitkin Smelting and Refining, Inc., was advised by plaintiffs on or about December 10, 1963, of plaintiffs' damages from lead poisoning coming from said smelting plant.

33. Sitkin Smelting and Refining, Inc., through its chief executive officer, Lewis Sitkin, denied that his smelting company was responsible for plaintiffs' damages and continued to operate its brass smelting furnaces without pollution controls and continued to operate its lead smelting furnace without adequate pollution controls.

34. In January 1964, plaintiffs killed for testing a typical cow which at the time had no symptoms of lead poisoning except low milk production, but which previously had clinical symptoms of lead poisoning, and the test results showed a relatively high concentration of lead in the kidneys, indicating an unusual intake of lead prior to death.

35. Cattle food containing in excess of three to four parts of lead per million is dangerous as food for cattle and becomes progressively more dangerous as the lead content increases; it taking larger doses of lead to kill than to produce deviations from good health.

36. The vegetation grown on plaintiffs' farm and leased lands was seriously contaminated with lead of the magnitude that made it unsafe and in fact dangerous to cattle consuming it.

37. Tests showed that silage made from the 1963 crop grown on plaintiffs' farm and leased land con-

tained such a high concentration of lead contamination, which was over 20 times normal, as to render the crop wholly unsuitable and dangerous for use as more than a very minor portion of the daily diet of cattle.

38. Tests taken of fresh vegetation growing on plaintiffs' farm and leased land early in the year 1964 showed a high concentration of lead averaging 8.5 times the normal concentration of lead, and indicated a surface contamination which made the vegetation unsuitable for use as food for cattle, and which if fed steadily for some months could have been expected to induce lead intoxication.

39. Tests taken of silage made from the 1966 crop grown on plaintiffs' farm and leased land showed it to be significantly and dangerously contaminated with lead from the aspect of its use as the primary forage for cattle.

40. A search made of plaintiffs' farmlands for a source of lead contamination competitive to the smelters of Sitkin Smelting and Refining, Inc., revealed none.

41. On September 17 and 18, 1964, the Bureau of Air Pollution Control for the Department of Health, Commonwealth of Pennsylvania, conducted stack tests on the lead blast furnace and on the brass smelting operation of Sitkin Smelting and Refining, Inc., to determine the constituents of the particulate being emitted into the atmosphere by means of said stacks.

42. As a result of said stack tests, it was ascertained that 4.48 pounds of particulate per hour was being emitted into the atmosphere by the lead blast furnace stacks and that of said weight 1.98 milligrams per cubic meter at standard conditions represented the amount of lead being emitted therefrom and that 221 pounds of particulate per hour was being emitted into

the atmosphere by the stacks for the 10 ton and 15 ton brass smelting furnaces and that of said weight 8.35 milligrams per cubic meter represented the amount of lead being emitted therefrom. No stack test was made at that time by the Commonwealth on the 25 ton brass smelting furnace.

43. The aforesaid 1.98 milligrams per cubic meter is equal to approximately 1.6 ounces of lead per hour emitted from the stack of the lead blast furnace and the aforesaid 8.35 milligrams per cubic meter is equal to approximately 6.4 ounces of lead per hour that would be emitted from the stacks of the 10 ton and 15 ton brass smelting furnaces.

44. From the aforesaid deductions, we may reasonably infer that the 25 ton brass smelting furnace emitted approximately the same amount of lead particulate as that emitted by the combination of the 10 ton and 15 ton brass smelting furnaces and that approximately 12.8 ounces of lead per hour were emitted from the stacks of the three brass smelting furnaces of 10, 15 and 25 tons, respectively, when all three of said furnaces were operating at the same time.

45. When all three brass smelting furnaces and the lead blast furnace were operating at the same time, approximately 14.4 ounces of lead per hour were emitted therefrom into the atmosphere.

46. For various periods of time beginning May 14, 1964, the Bureau of Air Pollution Control for the Department of Health, Commonwealth of Pennsylvania, conducted air sample tests by means of dust fall jars at three stations in the vicinity of the plant of Sitkin Smelting and Refining, Inc., including a station on the property of plaintiffs and a station on land leased by plaintiffs, to determine the amount of heavy particulate falling from the atmosphere. As a result of said air sample tests it was found that the average dust fall

rate was 105 tons per square mile per year, of which amount .44 percent was lead, equal to approximately a half ton of lead per square mile per year and that said amount of lead was excessive.

47. While some adjustment should be made in the estimated yearly amount of particulate falling to the ground in the vicinity of the plant of Sitkin Smelting and Refining, Inc., as determined from the stack tests and air sample tests, by reason of time expended for air lancing (blowing air into molten metal by inserting a pipe into same to obtain a proper mix, thereby causing additional effluent), the fact that the sampling periods may not necessarily be representative of the untested periods, allowance should be made for the time required to charge the furnace and later to pour the ingots and the down time of the furnaces when being repaired, the fact remains that the 24 hour a day, five days a week brass smelting operations by Sitkin Smelting and Refining, Inc., for more than five years immediately prior to November 1969, without any pollution controls from 1959 until 1967, caused injuries to plaintiffs by reason of the excessive lead particulate emanating from said operations.

48. According to a recognized authority, one pound of lead particulate will contaminate approximately 20,000 pounds of corn fodder produced on an acre of ground to the extent of 50 parts per million of lead and anything in excess of three or four parts per million of lead on forage crops is dangerous to cattle that are fed the same.

49. On March 22, 1965, Lewistown Smelting and Refining, Inc., now known as Sitkin Smelting and Refining, Inc., one of the defendants, was advised by letter from the Regional Air Pollution Control Engineer on behalf of the Commonwealth of Pennsylvania, of the results of the aforesaid stack tests performed

on September 17 and 18, 1964, and of the air sampling tests in the area of the plant of Sitkin Smelting and Refining, Inc., concluded on January 29, 1965, with the recommendation that said defendant proceed as rapidly as possible with its expressed plans to install an air pollution control system in its brass smelting operations.

50. The aforesaid letter enclosed the reports of said tests and said defendant was advised by said letter that from said tests, it can be observed that:

"1. Excessive quantities of particulate matter are being emitted to the atmosphere from the brass furnaces.

"2. More lead is being emitted to the atmosphere from the brass furnaces than the lead furnace.

"3. Lead concentrations in the atmosphere are at times unusually high."

51. On February 11, 1966, the Air Pollution Commission of the Department of Health, Commonwealth of Pennsylvania, issued to Lewistown Smelting and Refining, Inc., now known as Sitkin Smelting and Refining, Inc., its order that within 300 days from said date, said company was to abate the air pollution problem resulting from the particulate emissions from the brass smelting furnaces at its plant.

52. Sitkin Smelting and Refining, Inc., obtained extensions of time from said commission, the last extension ending the last part of February 1967.

53. Sitkin Smelting and Refining, Inc., from time to time, increased the height of the stacks for the smelting furnaces so as to disperse the particulate over a wider area.

54. In 1967, Sitkin Smelting and Refining, Inc., installed a high velocity wet scrubbing system known as a "Venturi scrubber," for its brass smelting operations. Said scrubbing system draws the gases by

means of a fan from the stack into a chamber in which water is spraying. The smoke is washed or scrubbed causing the particulate to be caught in filters and collection ponds after which the gas escapes into the atmosphere by means of the stack. When working efficiently the wet scrubbing system collects from 85 to 95 percent of the particulate.

55. A representative from the Bureau of Air Pollution Control was invited by Sitkin Smelting and Refining, Inc., to appear at its plant in April 1967 to witness the beginning operation of said air pollution control system but said system was not operating satisfactorily. After an unusual amount of time expended in experimentation, said bureau was advised by Sitkin Smelting and Refining, Inc., that it was ready for testing about February 15, 1968.

56. On March 13, 1968, the Bureau of Air Pollution Control for the Department of Health, Commonwealth of Pennsylvania, conducted stack tests on one of three stacks on the brass smelting operation of Sitkin Smelting and Refining, Inc., to determine whether said operation was in compliance with Regulation IV which had been adopted in 1966 by the Air Pollution Commission, Department of Health, Commonwealth of Pennsylvania, to regulate particulates.

57. The aforesaid stack tests were found to be in full compliance with said Regulation IV. The two other stacks used in the brass smelting operation were not tested because of the need of additional fan capacity in said stacks.

58. There is no evidence that Sitkin Smelting and Refining, Inc., has been in default of any lawful order of the aforesaid Air Pollution Control Commission since said tests of March 13, 1968.

59. On March 5, 1970, samples of blood, urine and milk were extracted from three cows on the McMillan

farm, about two to three miles to the east of Sitkin Smelting and Refining, Inc., and from a cow on the Cherry farm, about one and a half miles from said smelting operation. All of said samples when tested for lead by spectrographic analysis showed that they were within the normal range for normal cows.

60. On June 5, 1970, 13 samples of soil and 13 corresponding samples of vegetation were removed from plaintiffs' farm at various representative locations. Ten samples of soil and 10 corresponding samples of vegetation, all told, were removed from the Goss field directly across the road from plaintiffs' farm, from the Jonas Kauffman farm, being three and nine-tenths miles west of the entrance to Sitkin Smelting and Refining, Inc., and from the Floyd Noerr farm, one and six-tenths of a mile from said smelting plant and being the same farm which plaintiffs in the past had leased ground for their farm operations. All 23 samples of soil and all corresponding 23 samples of vegetation were divided between plaintiffs and original defendants. When defendants' division of said samples was tested for lead by spectrographic analysis, the average lead content from the soil and vegetation samples from plaintiffs' farm was essentially the same as the average lead content from the soil and vegetation samples from the Goss field, Jonas Kauffman farm and Floyd Noerr farm and all samples tested in the low range of normal for lead. The samples were obtained by pulling out a clump of vegetation (grass) and digging approximately two inches for the soil samples.

61. Lead is not soluble to any real degree in water or ordinary solvents found in nature. While some lead particulate falling to the ground can be plowed under the surface and in some cases and to some degree washed from higher levels by rain and melted snow

or blown by wind, lead particulate falling to the ground tends to remain where it falls.

62. There has been no substantial permanent damage to plaintiffs' farmland from the lead fallout, as of October 7, 1970, the date when testimony was closed in the within case, said damage from fallout having been confined primarily to the crops and vegetation grown on said farmland.

63. The use plaintiffs were making of their farm and leased lands as a home and for dairy purposes was well suited to the locality.

64. Plaintiffs maintained a low of 15 or 16 head of cattle in 1959 to a high of 46 head in 1964.

65. Only Sitkin Industries, Inc., and Wasco Corporation, defendants, conducted open burning.

66. Plaintiffs sustained no proven damages from said open burning.

67. Sitkin Smelting and Refining, Inc., acted in bad faith by its failure, from 1959 to 1967, to abate lead pollution caused by its smelting operations after having received notice from plaintiffs on or about December 10, 1963, of their damages caused by lead poisoning and by its unusually long delay in complying with the 300 days abatement order of the Air Pollution Commission, Department of Health, Commonwealth of Pennsylvania, issued to said smelting company on February 11, 1966.

68. From the time of the erection of the brass smelting operations by Sitkin Smelting and Refining, Inc., in 1959 until at least 1967, when pollution controls were installed, smoke was emitted from the stacks of the brass smelting furnaces of said company in various colors and shades, ranging from black, reddish brown, blue, yellow through orange to white, in volumes ranging to heavy, which said smoke cir-

culated up to two miles or more east and west of said stacks and over plaintiffs' farmlands.

69. Said smoke was plainly visible to all persons in that vicinity.

70. The smoke and effluent emitted from the smelting operations of Sitkin Smelting and Refining, Inc., left a fallout on plaintiffs' vegetation, buildings, and clothes on wash lines, discolored paint on property of plaintiffs, and left a residue that was difficult to clean or remove.

71. Said smoke and effluent was pungent, irritating, unpleasant and at times sickening. It caused coughing, sore throats, breathing difficulties, headaches, burning and watery eyes, inability at times to sleep with the windows open and irritation to plaintiffs and other residents of the surrounding area.

72. At times said smoke and effluent was of suffi cient volume that it almost obliterated the view of the smelter buildings and houses in the area, and depending upon weather conditions, hung in layers as a fog in the valley for as long as 48 hours at a time and as much as 10 to 12 days per month.

73. This condition, caused by Sitkin Smelting and Refining, Inc., amounted to a nuisance to plaintiffs and other residents of the surrounding area from 1959 until at least 1968.

74. Sitkin Smelting and Refining, Inc., knew that its brass smelting furnaces operated at temperatures between 1,800 and 2,000 degrees which temperatures cause lead to give off fumes.

75. Sitkin Smelting and Refining, Inc., knew that the lead recovery industry is one of the most hazardous industries to livestock and persons in the vicinity and that any smelting operation that involves lead must necessarily be a risk of serious harm to livestock,

property and persons in the vicinity which can be eliminated by the exercise of utmost care.

76. Prior to October 1962, Sitkin Smelting and Refining, Inc., was aware that some of its employes suffered from nausea and illness from lead fumes emitted at its smelting operations and that neighbors in the vicinity complained of fume problems emanating from said smelting operations and that said complaints continued at least into 1969, the complaint in 1969 having been made at a time when the brass smelting furnaces were in operation in spite of the fact that the air pollution controls were not working because said company was waiting for the arrival of parts to repair same.

77. After October 1962, and until 1968, Sitkin Smelting and Refining, Inc., knew or should have known that its smelting operations continued to function in such manner that there was reasonable likelihood that considerable quantities of lead particulate were being discharged into the atmosphere in the surrounding area to the detriment of livestock and persons in that area.

78. After the Regional Air Pollution Control Engineer on behalf of the Commonwealth of Pennsylvania had advised Sitkin Smelting and Refining, Inc., on March 22, 1965, that the 1964 tests of its smelters showed that excessive quantities of particulate were being emitted into the atmosphere with unusually high lead concentration, said smelting company added two additional furnaces to its brass smelting operations that increased its 50 ton capacity to a 200 ton capacity and knowingly and intentionally operated said increased facilities without air pollution controls until some time in 1967.

79. Sitkin Smelting and Refining, Inc., was aware of the nature of the emissions from its smelters as

a result of its own tests made from time to time, which test results it failed to offer in evidence in this proceeding.

80. Jerry Sitkin, President of Sitkin Smelting and Refining, Inc., at the time of tests by said Bureau of Air Pollution Control was a member of the Regional Air Pollution Board of the Commonwealth of Pennsylvania, said board having jurisdiction of the area in which said company's plant was located. Said board considered the pollution problem caused by said company and received reports thereon from the Regional Pollution Control Engineer.

81. Sitkin Smelting and Refining, Inc., exhibited its knowledge of its pollution problem by operating at night differently than in daylight so that the smoke and effluent could not be seen as readily at night as compared to daylight.

82. The use which Sitkin Smelting and Refining, Inc., is making of the land occupied by it is an artificial one whereby already marketable commodities are brought upon the land and by use of machinery said commodities are reduced to other forms. This constitutes a manufacturing or smelting use as compared to a natural use of the land such as mining.

83. While effective pollution control devices were on the market, and readily available prior to and at the time Sitkin Smelting and Refining, Inc., began its brass and lead smelting operations and their existence was known by Lewis Sitkin, chief executive officer of said company, said company was negligent and careless in that it knowingly and intentionally failed in its duty to plaintiffs and others to provide effective pollution control devices from 1959 to 1967 in order to prevent damage to plaintiffs' persons, their livestock and property.

84. The invasion of plaintiffs' interests by Sitkin Smelting and Refining, Inc., was intentional in that said company knew the invasion was resulting or was substantially certain to result from operating its brass smelting furnaces in a narrow valley, in close proximity to plaintiffs' farming operations, and without the use of any devices to control particulate emissions from 1959 to 1967 and erecting a lead smelter, known to said company to have fume problems, and operating it without adequate devices to control particulate emissions from 1962 to on or about 1965. Said brass and lead smelting operations continued and were increased after receipt of notice on or about December 10, 1963, of the harm being done to plaintiffs by lead.

85. Sitkin Smelting and Refining, Inc., without undue hardship or expense, could have avoided the substantial harm caused by it to plaintiffs.

86. Sitkin Smelting and Refining, Inc., was negligent and careless in the following particulars:

a. In knowingly and intentionally operating its brass smelting furnaces, from 1959 to 1967, without any pollution controls.

b. In knowingly and intentionally operating its brass smelting furnaces, from 1959 to 1967, without any pollution controls which said controls were readily available to control the escape of gases and effluents.

c. In failing to install any devices to control pollution in its brass smelting operations after receiving notice on or about December 10, 1963, of plaintiffs' damages from lead fallout.

d. In failing to install any devices to control pollution in its brass smelting operations for an unusually long period of time after notice on February 11, 1966, from the Air Pollution Commission

of the Department of Health, Commonwealth of Pennsylvania to abate said pollution.

e. In failing to have technically qualified personnel to maintain the pollution control equipment installed on or about 1967 in the brass smelting operations and to have technically qualified personnel to supervise adequate standards of evironmental control.

f. In failing to cease operations during long periods of time when the pollution control equipment in the brass smelting operations was defective or not functioning.

g. In carelessly purchasing and using a secondhand lead smelter with knowledge it had fume problems.

h. In failing to employ any technically qualified personnel in any field relating to plant design or erection or in pollution control installation, maintenance and operation for the secondhand lead smelter.

i. In failing to install adequate pollution controls for said secondhand lead smelter which were readily available.

j. In failing to enclose the secondhand lead smelter in a building with sides to avoid escape of fumes.

k. In failing to cease operations of said secondhand lead smelter during periods of time when pollution control devices were defective or not functioning, or during days when high winds blew lead fumes directly into the atmosphere.

l. In failing to use efficient equipment for the operation of a lead smelter and the control of effluent therefrom.

87. The operation of the brass smelters from 1959 to 1967 and the operation of the lead smelter from 1961 to 1965 by Sitkin Smelting and Refining, Inc., con-

stituted a private nuisance, in fact, to plaintiffs by reason of the discharge of poisonous and corrosive gases, smoke and lead particulate from said smelters, causing plaintiffs substantial injuries to their persons, livestock and property. Said poisonous and corrosive gases, smoke and lead particulate produced material annoyance, inconvenience and discomfort to plaintiffs.

88. Plaintiffs cannot recover from defendants on the theory of ultrahazardous activities because the risk of serious harm could have been eliminated by the exercise of the utmost care on the part of Sitkin Smelting and Refining, Inc.

89. The harm complained of by plaintiffs could have been avoided by Sitkin Smelting and Refining, Inc., without undue hardship or expense by installing efficient pollution controls in the smelting furnace stacks.

90. The wet scrubber method installed by Sitkin Smelting and Refining, Inc., in 1967, was technically and economically feasible in 1959 when said company began operating its brass smelters.

91. As a legal and proximate result of the aforesaid brass and lead smelting operations by Sitkin Smelting and Refining, Inc., lead particulate fell upon plaintiffs' crops and when fed to plaintiffs' livestock caused said livestock to become sick and in some cases to die, and said lead particulate coupled with poisonous and corrosive gases and smoke from said smelting operations caused annoyance, inconvenience and discomfort to plaintiffs.

92. Said lead particulate and poisonous and corrosive gases and smoke were so substantial as to cause legal injuries to plaintiffs' crops, livestock and to their persons.

93. Plaintiffs, lacking experience with smelting operations, were unaware of the cause of the sickness and death of their livestock until qualified veterinarians had conducted various tests and advised them of said cause shortly before December 10, 1963. By reason of Sitkin Smelting and Refining, Inc., defendant, thereafter increasing the height of its furnace stacks, plaintiffs were reasonably led to believe said defendant was taking steps to abate said cause. When it became apparent to plaintiffs that said defendant had failed to take the necessary steps to correct its pollution problem, plaintiffs abandoned their farm operations in February 1967, by reason of the substantial losses incurred by them beginning in 1960, caused by the lead poisoning of their livestock and crops, and disposed of their cattle, farm machinery and implements by public sale.

94. Plaintiffs were competent farmers and were diligent in the care of their livestock.

95. Cattle can absorb lead into their systems by breathing, absorption through their skins, ingesting soil when grazing, and consumption of vegetation containing fallout of lead components.

96. Herbivorous cattle are especially vulnerable to lead fallout on vegetation because the huge amount of vegetation consumed with a small amount of lead fallout is no longer a minute dose of lead.

97. Small and continuous amounts of lead absorption by cattle produces a progressive accumulation, of as much as 98 percent of the absorbed lead into its skeletal system, resulting in long term ill effects.

98. Cattle subjected to previous lead absorption are more susceptible to lead poisoning than cattle not previously subjected to lead absorption.

99. It takes less amount of lead in acid foods such

as silage, to induce lead intoxication in cattle than nonacid foods.

100. Cattle can have a low degree of lead poisoning with symptoms that may not be recognizable.

101. Lead poisoning in cattle creates a depression, a decrease in appetite and intake of milk producing food and causes a decrease in milk production as great as 50 percent and may also cause sterility and abortions.

102. Inasmuch as the only proven damage to plaintiffs resulted from the smelting operations conducted by Sitkin Smelting and Refining, Inc., we find no liability to plaintiffs on the part of the remaining original defendants.

103. The American Viscose Corporation and FMC Corporation, additional defendants, as owners and occupiers of land situate in Derry and Decatur Townships, Mifflin County, Pa., utilized said land for the disposal of waste materials from the operation of their plant in Granville Township, Mifflin County, Pa. Said additional defendants maintained a lagoon which was used in connection with the operation of said disposal site.

104. The lead content in the runoff from said lagoon into the Jacks Creek was minimal and in no way contributed to the cause of the damages sustained by plaintiffs. Consequently, we find no liability to plaintiffs on the part of additional defendants.

105. That the only times plaintiffs used water from Jacks Creek for irrigation was in 1963 and 1965, and then only for limited amounts of water and for a small portion of their farm lands.

106. There was no proof that there was lead in said creek where it is used for irrigation purposes, that the water which was taken by irrigation and used in irri-

gation contained lead and that this lead was deposited on plaintiffs' soil or on the vegetation.

107. There was no credible testimony that the irrigation contributed or caused damages sustained and alleged by plaintiffs.

108. That damages sustained by plaintiffs were not in any way caused by or in any way contributed to by the additional defendants.

109. Plaintiffs sustained the following damages:

(a) Plaintiffs suffered the loss by death of one Guernsey and of four Holstein cows that died from lead poisoning in December 1962, and January 1963, and their fair market value if free of lead poisoning at said time was $450 per cow, or a total loss of ... $ 2,250.00

Delay in payment from 1/31/63 to 1/31/73 ... 1,350.00

(b) Plaintiffs were obliged to sell in 1963, 1964, 1965 and 1966 for beef 22 dairy cows and 12 heifers adversely affected by lead ingestion, which resulted in low milk production, sterility and/or abortion and their fair market value if free of lead poisoning at said time was $450 per cow and $2,050 for the heifers. The difference between $11,950.00 for the 22 dairy cows and 12 heifers and the amount actually received to wit: $4,236.99, represents a loss to plaintiffs of ... 7,713.01

Delay in payment from 2/2/66 to 1/31/73 ... 3,236.89

(c) Plaintiffs' cost to transport said cattle to market was ... 135.00

Delay in payment from 2/2/66 to 1/31/73 ... 56.65

(d) Plaintiffs were obliged in February 1964, by reason of lead poisoning, to destroy 75 tons of corn silage having a fair market value, if free of lead, of $15 per ton and at a cost of $3 per ton to remove same from the silo, representing a loss to plaintiffs of 1,350.00

Delay in payment from 2/29/64 to 1/31/73 722.25

(e) Plaintiffs were obliged in February 1964, by reason of lead poisoning, to destroy 50 tons of Sudan Grass having a fair market value, if free of lead, of $12 per ton and at a cost of $3 per ton to remove same, representing a loss to plaintiffs of 750.00

Delay in payment from 2/29/64 to 1/31/73 401.25

(f) Plaintiffs were obliged in February 1964, by reason of lead poisoning to destroy 60 tons of corn fodder having a fair market value if free of lead of $15 per ton, representing a loss to plaintiffs of 900.00

Delay in payment from 2/29/64 to 1/31/73 481.50

(g) Plaintiffs were obliged by reason of lead poisoning to their herd of cattle to incur increased costs of veterinary services, over and above the average $10 per year per cow for said services, representing a loss to plaintiffs of

| | | |
|---|---|---|
| Year 1961 | 32 cows | 631.05 |
| Year 1962 | 45 cows | 366.60 |
| Year 1963 | 41 cows | 572.50 |
| Year 1964 | 46 cows | 154.30 |
| Year 1965 | 35 cows | 443.50 |
| Year 1966 | 38 cows | 120.65 |
| | or a total of | 2,288.60 |

| | |
|---|---:|
| Delay in payment from 12/31/66 to 1/31/73 | 835.34 |

(h) Plaintiffs were unable to use a leased 50-acre field in 1964 and a leased 30-acre field in 1965 and 1966 by reason of their close proximity to the smelting furnaces of Sitkin Smelting and Refining, Inc., and, accordingly, plaintiffs sustained a net loss in the amount of $25 per acre per year, or a total of     2,750.00

Delay in payment from 12/31/66 to 1/31/73     1,003.75

(i) Plaintiffs, by reason of the lead contamination, was unable from 1962 to 1965, to breed two Shetland ponies at a net loss to plaintiffs of $100 and two horses for said period of time at a net loss to plaintiffs of $300 or a total of     400.00

Delay in payment from 12/31/65 to 1/31/73     170.00

(j) Plaintiffs sustained the following milk production losses caused by lead contamination of their herd, vegetation and crops (based on a comparison with the average annual per cow milk production for the members of the Dairy Herd Improvement Association for Mifflin County):

| | |
|---|---:|
| From October 1, 1959, to September 30, 1960 | 1,650.62 |
| From October 1, 1960, to September 30, 1961 | 866.83 |
| From October 1, 1961, to September 30, 1962 | 2,501.74 |
| From October 1, 1962, to September 30, 1963 | 1,140.14 |

| | | |
|---|---|---|
| From October 1, 1963, to September 30, 1964 | 2,906.76 | |
| From October 1, 1964, to September 30, 1965 | 1,535.28 | |
| From October 1, 1965, to September 30, 1966 | 3,624.16 | |
| For October, 1966 | 391.88 | |
| For November, 1966 | 682.34 | |
| For December, 1966 | 710.98 | |
| For January, 1967 | 712.64 | |
| For February, 1967 | 862.65 | |

or a total of 17,586.02

Delay in payment from 2/28/67 to 1/31/73 6,243.04

(k) Plaintiffs are awarded damages for the annoyance, inconvenience and discomfort to them which consisted in frequent sore throats, headaches, sensation of eyes burning, inability, at times, to sleep with the windows open, discoloration of painted surfaces, soiling of clothes on wash line and being required to spend extra hours of work tending to sick cattle, all of which were caused by poisonous and corrosive gases, smoke and lead particulate from the smelting operations, in the sum of 2,000.00

Total $52,623.30

## DISCUSSION

Problems of lead fallout from lead smelters, causing damage to cattle and vegetation are of ancient origin. These problems have been well recognized for many years by the smelting industry. Blackstone, in his Commentaries of the Laws of England, stated:
"If one erects a smelting-house for lead so near

the land of another that the vapor and smoke kill his corn and grass, and damage his cattle therein, this is held to be a nuisance."

The above passage was quoted with approval by the Pennsylvania Supreme Court in 1881, in Appeal of Pennsylvania Lead Company, 96 Pa. 116 (1881), wherein the court affirmed a farmer's award for damage to his farm from lead fallout from defendant's lead smelter. More recently, in Eisenbrown et al. v. Bowers Battery and Spark Plug Company, 48 Berks 248 (1956), and 49 Berks 172 (1957), area residents in an equity proceeding were awarded damages resulting from lead fallout.

The public at large in the past few years has become ecology conscious and aware of the constantly growing and continuous sources of dangerous air and water pollution.

## EXPERT TESTIMONY NOT REQUIRED

Our Supreme Court, in Appeal of Pennsylvania Lead Company, supra, at page 125 said:

"All intelligent persons are aware that lead vapors are poisonous . . . In this matter we need not chemists and experts to teach us, for common experience is sufficient. When, therefore, we learn that the works of the defendant are to the windward of the plaintiff's land . . . we need but little evidence to satisfy us that the smoke from these works is seriously injurious to his property."

In Kent v. General Chemical Company, 285 Pa. 34, 37, 131 Atl. 588 (1925), where plaintiff's farm was damaged from the smoke from defendant's plant located on the opposite side of the Monongahela River about one-half mile away, the court, referring to the fact that the farmer had no expert witness, said:

"Where facts from which causal connection may

be found have been testified to with sufficient clearness and definiteness that a layman in the ordinary affairs of life could infer the cause from the effect, expert evidence is not necessary. If the testimony of experts were to be required in every case, many meritorious ones would fail; it would place an undue burden on poor litigants."

In Procz et al. v. Americin Steel & Wire Company of New Jersey, 318 Pa. 395, 178 Atl. 689 (1935), plaintiff farmer testified that within a few years after defendant's mill began to operate near his farm, his vegetation began to die in the wake of smoke which came only from the mill and hovered through the valley and over his farm and that the smoke consisted of minute particles of zinc oxide. The Supreme Court held such testimony was sufficient to show causal connection between defendant's mill operations and plaintiff's damage, and that expert testimony to show causal connection was not necessary.

Judge Medina in Achilles v. New England Tree Expert Co., 369 F. 2d 72, 73 (1966), holding sufficient a farmer's testimony that his cows died after drinking water from his water hole after he found drums and pails at the water hole left by defendant's men who had just finished spraying weeds, stated:

"But there are cases where common sense is more reliable than any amount of expert witnesses, and this is one of these cases."

There are many cases to the same effect: Burkhardt v. American Steel & Wire Company, 74 Pa. Superior Ct. 437 (1920); Sullivan v. Jones & Laughlin Steel Company, 208 Pa. 540, 57 Atl. 1065 (1904); Graff v. American Steel & Wire Company, 91 Pitts. 159 (1942) (smoke and gas from plant to farm one and one-half miles away); Stanislaw et al. v. Reading Corrugated Container Corp., 47 Berks 207 (1954); Silvestri v.

Metallic Finishers, 74 Montg. 356 (1957), holding scientific measurements of vapors is not necessary to prove the vapors are injurious to public health and that subjective complaints were sufficient evidence.

The lay testimony in the instant case is clear and convincing that plaintiffs' damages were caused by defendant's smelters. In addition to the lay testimony, plaintiffs produced expert testimony which alone, independently of the lay testimony, proved the same thing. The lay and expert testimony taken together is overwhelming proof of causal connection.

## SUFFICIENCY OF EXPERT TESTIMONY

Expert testimony is sufficient if the expert testifies that in his opinion the gas (or smoke or fumes), under the circumstances "could and in all probability did, cause the injurious results complained of . . ." Ribblett v. Cambria Steel Co., 251 Pa. 253, 257, 96 Atl. 249 (1916). The inability of an expert to give a "positive opinion" does not keep him from scientifically appraising the "probabilities" and it is error to exclude such testimony: Bialek v. Pittsburgh Brewing Company, 430 Pa. 176, 242 A. 2d 231 (1968).

The testimony of plaintiffs' experts was even more positive than the law requires and clearly and unequivocally proved the causal connection of defendant's smelters with plaintiffs' damages from lead fallout.

## BURDEN OF PROOF

Plaintiff is only required to make out his case by a fair preponderance of evidence. Our Supreme Court in Smith v. Bell Telephone Company of Pennsylvania, 397 Pa. 134, 153 A. 2d 477 (1959), held that it is not necessary that every fact or circumstance point unerringly to liability, but it is enough that there be

sufficient facts for the jury, or the court in an equity case, to say that the preponderance favors liability.

When an occupier of land so uses it, especially when the use is not a natural use but an artifical use as is the case at hand, as to interfere with another landowner, the law places an affirmative burden of proof on such occupier.

In Herring v. H. W. Walker Company, 409 Pa. 126, 134, 185 A. 2d 565, 568 (1962), where defendant caused damage by discharging vapors from its smokestacks, the Supreme Court held:

"The burden was on defendants to show that the use of their property which caused the injury to plaintiffs was unavoidable or could not have been prevented except by an expenditure which would have substantially deprived them of the use of their property."

In Conti v. New Castle Lime & Stone Co., 94 Pa. Superior Ct. 321 (1928), where dust from a limestone crusher was deposited by the wind onto plaintiff's land, the Superior Court said, at page 326:

"The use which the defendant is making of its land is an artificial one, they bring upon their land an already marketable commodity and by use of machinery reduce it to another form."

The court then pointed out that no artifical use of land can be permitted to destroy the use of another's land, and that

" 'It is not to be lost sight of that the defendant's right to injure another land at all, to any extent, is an exception, and the burden is always upon him to bring himself within it' ": Page. 325.

Muehlhausen v. Delaware Valley Holding Company, 9 Bucks 188 (1958), held that where an occupier of land so uses it that the use interferes with another landowner's use, the burden is upon the former to

establish that the activity is conducted in a reasonable manner, with due care, without malice, and that the damage is unavoidable.

The testimony shows clearly that defendant, Sitkin Smelting and Refining, Inc., in conducting smelting operations is making an artificial use of the land occupied by it which does damage to plaintiffs. However, defendant's proofs are devoid of any testimony to show that the damages are unavoidable, that defendant carried on its activities in a reasonable manner and with due care. Said defendant has not even tried to meet the burden cast upon it. Plaintiffs' proofs, however, clearly show that said defendant operated without due care, in an unreasonable manner and that the damages were avoidable.

Plaintiffs have charged defendants with liability on four different theories. Proof on any one theory is sufficient to hold a defendant or defendants liable in damages to plaintiffs. Changing the order of these theories of liability from the order in which they are pleaded, we have for consideration: (A) Intentional and unreasonable invasion; (B) Negligence; (C) Nuisance; (D) Ultrahazardous activities.

## A. INTENTIONAL AND UNREASONABLE INVASION

The Supreme Court, in the case of Waschak v. Moffat, 379 Pa. 441, 448, 449, 109 A. 2d 310 (1954), adopted section 822 of the Restatement, Torts, page 226, as the governing rule for nontrespassory invasions. This rule is as follows:

"The actor is liable in an action for damages for a non-trespassory invasion of another's interests in the private use and enjoyment of land if,

"(a) the other has property rights and privileges

in respect to the use or enjoyment interfered with; and

"(b) the invasion is substantial; and

"(c) the actor's conduct is a legal cause of the invasion; and

"(d) the invasion is either

"(i) intentional and unreasonable; or

"(ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct."

The Waschak case was an action for damages by gas emitted from culm banks. It was tried on the single theory of absolute liability, is not applicable to the case at bar, and is distinguishable in the following respects: (1) plaintiffs in that case purchased their property after the culm banks were there, knowing they were in a mining district; (2) "the emission of gases was not caused by any act of defendants and arose merely from the normal and customary use of their land . . .", at page 455; (3) defendants did not know and had no reason to be aware that this particular gas would be emitted. The court found the invasion was unintentional, not unreasonable, without negligence, recklessness or hazardous conduct.

The court in the Waschak case did point out what "intentional" means under section 822 of the Restatement, Torts, at page 447:

"An invasion of an interest may be *intentional* or *unintentional.* If an owner of land erects a factory upon it, which he operates, his act is, of course, *intentional* when he ignites fires under the boilers which emit smoke or fumes, and operate noisy machinery." (Italics supplied by Supreme Court.)

Waschak was followed by Burr v. Adam Eidemiller, Inc., 386 Pa. 416, 126 A. 2d 403 (1956). This was an action for damages from subterranean contamination

against a road contractor who leased land adjoining plaintiff's land, hauled slag thereon and leached it with water which contaminated plaintiff's spring. Plaintiff notified defendant of his damage but defendant continued with his operation. Plaintiff brought his action under sections 822 and 825 of the Restatement for an intentional and unreasonable invasion. The court held the invasion was *intentional* because defendant was notified of the damage he was causing and continued after he knew about it. It was held the invasion was *unreasonable* because the harm was avoidable by using corrugated sheets to stop run-off water, because the area was rural and not suited to the particular activity and because the activity was not a natural use of the land.

Where mine lessor and mine lessee notified surface owner, who maintained dump on the surface, that dumping of sludge on the surface was causing seepage of sludge into mine and consequent damage to mine and interference with mining operations, surface owner's continued dumping gave grounds for cause of action for intentional trespass: Curry Coal Company v. M. C. Arnoni Company, 439 Pa. 114, 266 A. 2d 678 (1970).

What constitutes intentional invasion is defined by section 825 of the Restatement, Torts, as:

"(a) [where the actor] acts for the purpose of causing it; or

"(b) [where the actor] knows that it is resulting or is substantially certain to result from his conduct."

Comment (b) under that section is, in part, as follows, at page 239:

"Most of the litigation over non-trespassory invasions of interests in the use and enjoyment of land involves situations in which there are continuing or recurrent invasions resulting from continuing or

recurrent conduct. In such cases the first invasion resulting from the actor's conduct may be either intentional or unintentional, but when the conduct is continued after the actor knows that the invasion is resulting from it, further invasions are intentional."

Section 830 of the Restatement, Torts, provides that "an intentional invasion of another's interest in the use and enjoyment of land is unreasonable and the actor is liable when the harm is substantial and it would be practicalbe for the actor to avoid the harm in whole or in part without undue hardship." The Noerrs sustained substantial harm which could have been avoided by Sitkin Smelting and Refining, Inc., without undue hardship, by installing efficient anti-pollution devices in their smelting stacks, but no such device was installed in the brass smelting operation until 1967 and the device used by the lead smelting operation was not effective. There has been no testimony that efficient pollution devices were not practicable at the time said defendant began its smelting operations in 1959.

The case of Eisenbrown v. Bowers B. & Spark Plug Co., supra, is a case almost similar to the instant case. There, defendant, in addition to manufacturing batteries operated a smelter to reduce old storage batteries to lead and a bill in equity was instituted by neighbors to enjoin such operation which caused damages from the lead fumes and fall-out, and to collect damages. Some relevant portions of the court's opinion, reported in 48 Berks at page 253, follow:

"The Chancellor at the very inception of the hearings, was certain that for many years prior to the filing of the bill, the defendant did not use the most up-to-date and improved methods applicable to the operation of a smelter plant. The defendant, however, did from time to time, attempt to improve its method

of operation. As it now appears, certain things that should have been done a long time ago would have been to establish a washery which is now being used. This was not installed by defendant until quite some time after the filing of the bill . . . It is the duty of an operator of an industrial plant to secure such devices or management and if it fails to do so, then the Court could properly conclude that the smoke etc. emitting from its plant may be regarded as unnecessary and unreasonable."

This court makes this observation at page 257:

"One must conclude that for many years, the defendant failed to use the most improved methods. It was only in 1951, quite some time after the filing of the bill that the washing system was installed. Much that was left undone by the defendant could have been done, with a result that long before the filing of the bill, the nuisance that really existed could have been substantially abated."

The court also stated at pages 258, 259:

"The defendant manifestly was so well informed as to the probable harmful effects of the manner of their operation, that in reality a trier of the facts could regard their actions as an intentional invasion of the rights of the plaintiffs."

On exceptions, the court rendered a second opinion reported in 49 Berks 172 (1957), wherein the court further said, at page 174:

"It becomes manifest that the defendant, itself, by its own testimony, has shown that it was well aware of what it was doing; that it was seeking some method to eliminate the nuisance but did nothing from 1941 until 1951, a period of ten years, until plaintiffs filed their Bill in Equity in April of 1950."

"The plaintiffs' testimony demonstrates that the defendant's plant, as it was operated, became a

nuisance and that was the reason plaintiffs filed their Bill . . . Surely the defendant can not successfully argue, therefore, that the wet scrubbing system was something that was discovered or invented after this suit was filed. It existed before. Other smelting companies used it but the defendant did not. Defendant only began using it when he was forced to do so by the institution of the present action."

"The use of this system has not achieved perfection. The nuisance still exists but the installation of the wet scrubbing device resulted in an improvement."

Evans v. Moffat, 192 Pa. Superior Ct. 204, 160 A. 2d 465 (1960), is an opinion on 25 cases claiming damages to real estate from gases emanating from mine refuse dumps maintained by Moffat Coal Company. After the Supreme Court in Waschak v. Moffat, supra, clarified the law, these cases were tried under section 822 of the Restatement, Torts, on the theory that defendant's invasion was intentional and unreasonable (and not on the theory of absolute liability used in the Waschak case); and more specifically under Section 825(b), where the actor knows "that it [the invasion] is resulting or is substantially certain to result from his conduct." The trial judge made findings of fact supported by the testimony and the only question before the Superior Court was whether the trial court's findings were supported by the evidence.

On the question whether defendant's acts were intentional, the court quoted finding no. 53 of the court below as follows:

" 'The invasion of the plaintiffs' interests was intentional in that the defendants knew the invasion was resulting and was substantially certain to result from their conduct, and yet persisted in such conduct by

establishing new refuse dumps in residential locations.'"

The Superior Court stated that this finding was preceded by detailed findings which showed that after a dump started to oxidize and burn and give off gases, defendant moved to new sites in built-up sections, which sites in turn oxidized, and burned; and gave off various fumes and gases; and such further findings as:

". . . that Moffat knew or should have known when constructing the Washington Street bank that it could oxidize, ignite and give off products of combustion . . ."

". . ."

". . . that Moffat knew or should have known of the nature of the products of oxidation or combustion of the materials in the various banks, dams and dumps, of the harmful effects to property and persons and of the high probability of the circulation of such products by atmospheric means and that as a coal operator of experience, Moffat could be expected to know the familiar history of burning culm banks in the anthracite industry and had available the technical services and personnel to obtain such knowledge": (Pages 213, 214).

The Superior Court held that the findings were supported by credible evidence and then took up the question of whether the invasion was unreasonable. The court pointed out that this basic finding was supported by other findings such as "that the use the plaintiffs were making of the properties as homes as well suited on the locality; . . . that the harm complained of by the plaintiffs could have been avoided by the defendant without undue hardship or expense . . ."

The Superior Court stated, at page 220:

"The court below concluded that the invasion of plaintiffs' interest in the use and enjoyment of their own land was unreasonable as well as intentional. With that conclusion we agree."

Applying the law above cited to the proven facts, the invasion of plaintiffs' interest in the use and enjoyment of their home and farm by Sitkin Smelting and Refining, Inc., was intentional:

1. Under the Waschak case ruling, and paraphrasing it, since defendant, Sitkin Smelting and Refining, Inc., erected a factory and operated it, its acts are, of course *intentional* when it ignited fires in the smelter furnaces which emitted lead oxide fumes.

2. Under the Burr v. Adam Eidemiller ruling, and section 825 of the Restatement, Torts, the invasion was intentional because said defendant was notified of plaintiffs' damage and continued operating thereafter for about five years without any pollution controls.

3. Under the holding of Eisenbrown v. Bowers, since said defendant did attempt unsuccessfully, in a crude way to improve the pollution controls on the lead smelter from time to time and also raised the height of their smokestacks to get wider dispersion of the effluent, and at the same time made no effort to control the lead oxides belching out of the sixth largest brass smelter in the United States, it was manifestly so well informed of the probable harmful effects of the manner of its operation, that in reality a trier of the facts could regard its actions as an intentional invasion of the rights of the plaintiffs.

4. Under the holding of Evans v. Moffat, the invasion was intentional because defendants knew that damage was substantially certain to result from its conduct because:

a. As a smelter of experience, said defendant could be expected to know the familiar history of lead poisoning and lead fallout in the lead and brass smelting industry and had available technical services and personnel to obtain such knowledge.

b. Said defendant knew or should have known that lead oxides came out of the smelter smokestacks and of the high probability of the circulation thereof by atmospheric means.

c. That after damage occurred to plaintiffs, said defendant raised the height of its smokestacks to scatter the effluent further away.

d. That when constructing the brass smelter with no pollution controls, and when purchasing and erecting the secondhand lead smelter which it knew had a fume problem, said defendant knew that fallout of lead oxides would occur.

The invasion was unreasonable under the facts as applied to the cases above cited:

1. Under the ruling of the Waschak case, paraphrasing it, the area here involved was residential and rural and said defendant's smelter activity was not a natural use of the land.

2. Where such conduct causes substantial damage to plaintiffs' farming, which farming is suitable to the locality, the invasion is unreasonable although defendants are taking all practicable measures to avoid harm: Section 831, comment a, Restatement, Torts.

3. Since said defendant failed to secure the most up-to-date control devices, the smoke and effluent may be regarded as unnecessary and unreasonable: Eisenbrown v. Bowers.

4. Plaintiffs' farm operation was well suited to the locality and the harm caused could have been avoided by said defendant without undue hardship.

## B. NEGLIGENCE

Section 822 (d) (ii) of the Restatement, Torts, provides:

"The actor is liable in an action for damages for a nontrespassory invasion of another's interest in the private use and enjoyment of land if (d) the invasion is

"(ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct."

"Negligence is the want of care required by the circumstances. It may 'lie in omission or commission, in the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or in doing what such a person under the existing circumstances would not have done,' Baltimore Railroad Co. v. Jones, 95 U.S. 439": McCloskey v. Chautauqua Lake Ice Co., 174 Pa. 34, 36, 34 Atl. 287 (1896).

The uncontradicted testimony shows that the Sitkin Smelting and Refining, Inc., was negligent in numerous respects, each of which was the direct cause of plaintiffs' damages.

### 1. *Erecting and Operating Brass Smelter.*

The testimony shows that Sitkin Smelting and Refining, Inc., was negligent in the erection and operation of the brass smelter in the following respects:

(a) In failing to install any pollution control devices at the time the smelter was erected.

(b) In operating the smelter over a long period of years without any devices that were readily available to control the escape of gases and effluents.

(c) In failing to install any devices to control pollution after notice of pollution damage to plaintiffs.

(d) In failing to install devices to control pollution for an unusually long period of time after notice from the Commonwealth of Pennsylvania to abate pollution.

(e) In failing to have technically qualified personnel to maintain the pollution control equipment and supervise adequate standards of environmental control.

(f) In failing to cease operations during long periods of time when pollution control equipment was defective or not functioning.

2. *Purchasing, Erecting, and Operating Lead Smelters.*

The testimony shows that said defendant was negligent in the purchase, erection and operation of the lead smelter in the following respects:

(a) In carelessly purchasing and using a seconhand lead smelter with knowledge that it had fume problems.

(b) In failing to employ any technically qualified personnel in any field relating to plant design or erection, or in pollution control installation, maintenance and operation.

(c) In failing to install adequate pollution controls which were readily available.

(d) In failing to enclose the smelter in a building to avoid escape of fumes.

(e) In failing to cease operations during periods of time when pollution control devices were defective or not functioning, or during days when high winds blew lead fumes directly into the atmosphere.

(f) In failing to use efficient equipment for the operation of a lead smelter and the control of effluent therefrom.

## C. NUISANCE

We hold that the operation of a brass smelting plant in a rural and residential area is not a nuisance per se but may become a nuisance in fact if improperly conducted. See Essick v. Shillam, 347 Pa. 373, 32 A. 2d 416 (1943); Waschak v. Moffat, supra. The Waschak case quoted with approval Chief Justice Schaffer's definition of nuisance that appears in Kramer v. Pittsburgh Coal Company, 341 Pa. 379, 19 A. 2d 362 (1941), as follows at page 381: " '. . . In legal phraseology, the term "nuisance" is applied to that class of wrongs that arise from the unreasonable, unwarrantable, or unlawful use by a person of his own property, real or personal, or from his own improper, indecent, or unlawful personal conduct, working an obstruction or injury to a right of another, or of the public, and producing such material annoyance, inconvenience, discomfort or hurt that the law will presume a consequent damage': 46 C. J. 645-646. 'Nuisance is distinguishable from negligence': Ibid, 650. 'The distinction between trespass and nuisance consists in the former being a direct infringement of one's right of property, while, in the latter, the infringement is the result of an act which is not wrongful in itself, but only in the consequences which may flow from it': Ibid, 651. As we stated in Summit Hotel Co. v. National Broadcasting Co., 336 Pa. 182, 189, 8 A. 2d 302; 'In cases of trespass for nuisance, the person responsible may be unable, no matter how careful, to avoid injury to the lands of another, but, again, he knows that injury may result from the nature of his activities regardless of care. Under such circumstances, he also assumes the risk. The responsibility for injury lies in creating or maintaining the harmful condition.' "

"The corruption of the atmosphere by the use of

property which impregnates it with smoke or offensive odors to the annoyance of a resident or residents nearby constitutes a nuisance": Babinetz v. Generose, 46 Luz. 273 (1956).

The discharge of lead fumes from a smelter has been adjudicated to be a nuisance. The court in Eisenbrown v. Bowers B. & Spark Plug Co., supra, concluded as a matter of Law:

"(1) The discharge by the defendant in the immediate vicinity of plaintiffs' homes of fumes, odors and gases constituted a nuisance": 48 Berks at page 261.

The Supreme Court in the Appeal of Pennsylvania Lead Co., supra, concluded in 1881 that such activity by a lead smelter is not just a nuisance but a dangerous nuisance:

"The business complained of is a dangerous nuisance; the injury continuous and cumulative, and the mischief irreparable": Page 126.

English law in the eighteenth century, according to Blackstone, supra, held that a lead smelter causing damage to vegetation and cattle in the vicinity is a nuisance.

The evidence produced by plaintiffs showed that said defendant's operation discharged irritating and acrid fumes, lead components, smoke and odors into plaintiffs' and neighboring houses, buildings and lands, causing damages to paint on the buildings, lead poisoning to domestic animals from the fallout, illness, irritation and discomfort to residents generally of the area. This is ample proof that the said defendant's smelters constituted a nuisance in fact until 1967 when air pollution controls were installed.


## D. ULTRAHAZARDOUS ACTIVITIES

We are satisfied that plaintiffs are entitled to recover

damages from Sitkin Smelting and Refining, Inc., on each of the preceding theories, to wit:

1. Intentional and unreasonable invasion; 2. negligence; 3. nuisance. Plaintiffs are entitled to recover if only one of the said theories of liability has been established.

We do not believe plaintiffs can recover under the ultrahazardous activities theory because section 520 of the Restatement, Torts, defines an activity as ultrahazardous if it:

"(a) . . . necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and

"(b) . . . is not a matter of common usage."

Section 519 of said Restatement, adopted as the law in Pennsylvania by Federoff et ux. v. Harrison Construction Co., 362 Pa. 181, 66 A. 2d 817 (1949), speaks of the "unpreventable miscarriage of the activity (blasting) for harm."

It is true that in 1881, in Appeal of Pennsylvania Lead Co., supra, after the master had found that defendant's "furnaces and other appliances are abreast of the times as to improvements, and every precaution has been taken for the prevention of the escape of lead from their flues known to the most expert in the business . . ." the Supreme Court held defendant liable for poisoning plaintiffs' soil and vegetation, cattle and horses and characterized defendant's business as a "dangerous nuisance."

However, modern technology has provided smelting plants with at least two well recognized and efficient methods to effectively prevent serious damage to soil, vegetation, animals and humans. Both methods were described in the testimony in the instant case. They are known as the bag house method and

the wet scrubber method. The experts pointed out that either method must be carefully installed, maintained and regularly inspected by competent personnel and smelters should not be operated where there has been a breakdown in the pollution control or where same is not operating efficiently.

Dr. Edward Adler, called by defendants, testified that the wet scrubber method is not 100 percent efficient and that no process is. He gave as his opinion that the scrubber used by Sitkin Smelting and Refining, Inc., is pretty efficient, collecting 85 to 95 percent of the effluent.

The chief cause of damage to plaintiffs resulted from the failure of Sitkin Smelting and Refining, Inc., to install any type of pollution control to its five brass smelting furnaces and stacks until 1967. These furnaces, originally three in number, were operated from 1959 to 1967 at full capacity most of the time, without controls and as a result a large amount of lead particulate fell upon plaintiffs' soil and crops and their cattle, horses and ponies, having fed upon said contaminated crops, became ill and in some cases died. Then, too, the pollution control used by said defendant in its operation of its secondhand lead smelter was inefficient.

## DAMAGES

Having determined that Sitkin Smelting and Refining, Inc., is liable to plaintiffs on each of the following theories: intentional and unreasonable invasion, negligence and nuisance, we turn now to a consideration of damages.

"As a general rule, the measure of damages for the total loss or destruction of personal property is its reasonable value at the time of loss . . .": 11

P. L. Encyc., Damages, 158 §59. See also 25 C. J. S. 905.

"The measure of damages for the destruction of, or injury to, a crop is its value at the time and place of the destruction or injury": 11 P. L. Encyc., Damages, 161, §60; Taylor v. Canton Township, 30 Pa. Superior Ct. 305 (1906); 25 C. J. S. 935.

For injury to animals, damages may include depreciation in value and veterinary expense: Lyons & Treon v. Harrisburg Consumers' Brewing Company, 25 C. C. 202, 206 (1901); value of time spent in caring for sick animals, expense of beef, loss of use, loss of productivity including loss of milk production: 4 Am. Jur. 2d, Animals, §146; 49 A. L. R. 2d 300, 302, 304; 79 A. L. R. 2d 721. See also Glasgow v. City of Altoona, 27 Pa. Superior Ct. 55 (1905).

Plaintiffs farmed some fields that they had leased from the respective owners. They were unable to farm these fields from 1964 to 1966, inclusive, by reason of the lead fallout. A tenant can recover for an injury to his use and enjoyment: Seely v. Alden, 61 Pa. 302, 305 (1869). See also 49 A. L. R. 2d 278, §9; Pittsburgh & Lake Erie R. R. v. Jones, 111 Pa. 204, 2 Atl. 410 (1886).

Damages for personal annoyance, inconvenience and discomfort from odors, gases, smoke and lead particulate "are like unto the damages which the law allows for pain and suffering from personal injury caused by negligence; wholly within the sound discretion of the jury": Waschak v. Moffat, supra; Stanislaw et al. v. Reading Corrugated Container Corp., supra.

In Evans v. Moffat, 192 Pa. Superior Ct. 204, plaintiffs were awarded $5,700 "in addition to the market value loss, for annoyance and discomfort." The court said, at pages 221 and 222:

"The additional award was for the personal annoy-

ance and discomfort the plaintiffs suffered—not merely loss of use and enjoyment. The evidence supports such award for personal damages in addition to physical property damage. The plaintiffs suffered nausea and headache and they were required to perform more housework and suffered irritation of the nose and throat membranes as a result of the gases."

See also 142 A. L. R. 1307; Gavigan v. The Atlantic Refining Company, 186 Pa. 604, 40 Atl. 834 (1896).

According to our finding of fact 46, the Bureau of Air Pollution Control found that in 1964, the average dust fall rate for the three stations in the vicinity of Sitkin Smelting and Refining, Inc., was 105 tons per square mile per year, of which amount, .44 percent was lead. This equals .462 tons of lead per square mile. There are 2,000 pounds to a ton. The .462 tons of lead equals 924 pounds. There are 640 acres in a square mile. Based upon the results of the test in 1964, and dividing 924 pounds of lead by 640, we have 1.44 pounds of lead per year per acre. Dr. Kehoe testified that one pound of lead particulate will contaminate 20,000 pounds of corn fodder to the extent of 50 parts of lead per million. An acre of land for a good crop in a dry year should produce 10 tons or 20,000 pounds of corn fodder. Even allowing for the fact that the corn fodder would not have been growing as corn and later kept in or on the ground as corn fodder for a whole year and considering the other matters as pointed out in our finding of fact 47, it is apparent that the amount of lead particulate on forage crops in 1964 in the vicinity of Sitkins Smelting and Refining, Inc., was many times in excess of the danger point of three or four parts per million.

The stack tests conducted by said bureau in 1964 showed a dangerous amount of lead particulate being disseminated into the atmosphere. The various tests

for lead in the crops and silage and in the organs of the deceased cattle clearly demonstrate the large amount of lead particulate that was found in the crops, silage and animals.

Dr. Robert Kehoe, a noted physician who has devoted a lifetime to the study of lead pollutants characterized the secondary lead smelting industry, such as the type of lead smelting done by Sitkin Smelting and Refining, Inc., as "one of the most intrinsically dangerous lead operations that we are concerned with." Defendants' witness, Dr. Milton H. Cohen, admitted that lead fumes are dangerous, and that the lead recovery industry is one of the most hazardous of all industries. Another witness for defendants, Dr. Thomas McGraw, testified that there is "always a potential hazard" in the lead industry. Dr. Paul B. Hammond, a defendant witness, testified that when smelter equipment breaks down there is a hazard to farm animals.

From the results of the aforesaid tests as well as the clinical diagnoses made of the living cattle and other evidence, we have awarded damages for the loss of the five cows that died, the loss sustained when plaintiffs were obliged to sell for beef 22 dairy cows and 12 heifers, the cost of transporting same to market, the value of corn silage, Sudan grass and corn fodder that had to be destroyed and the cost of removing same, increased veterinary services, loss of use of leased fields, loss for inability to breed the ponies and horses, loss by reason of reduced milk production and loss for annoyance, inconvenience and discomfort suffered by plaintiffs. Lead particulate or fallout from the smelting operations of Sitkin Smelting and Refining, Inc., was the cause of all of the aforesaid damages. In the case of the annoyance, inconvenience and discomfort of plaintiffs, poisonous

and corrosive gases and smoke from said smelting operations added to said discomfort.

## REASONABLE CERTAINTY OF PROOF

Plaintiffs' proofs of damages are not required to be made with mathematical certainty. This is illustrated by the case of Kohr et al. v. Weber et al., 57 Lanc. 57, 68 (1959), which was a bill in equity to enjoin a drag strip race track, and to recover damages to chinchillas resulting from the noises which caused the animals to chew their fur. The court held:

"The plaintiff's loss cannot be calculated mathematically with absolute certainty, but it can be fixed with reasonable certainty."

The evidence showed normal loss of 3.4 percent for the year prior to the racing, the only year prior in which records were kept, and for the three years thereafter which averaged 21.2 percent or a difference of approximately 16 percent. The court felt some present loss was due to other noises and allowed a 10 percent loss.

In Achilles v. New England Tree Expert Co., supra, Judge Medina was extremely liberal in sustaining proofs of damages which were very indefinite. His remarks at 369 F. 2d 73, 74, are relevant to show how indefinite the evidence was:

"Farmer Achilles had prepared himself as well as he could for the ordeal of explaining how he calculated his loss . . . As the condition of the cows varied from year to year, as some improved and some grew worse as a result of the poisoning, it was not easy to make a precise showing of the number of cows sold for beef in 1961, 1962 and so on . . . As to the loss of milk production, this went up and down, it was on the whole 25%. The figures are bewildering."

## DAMAGES RECOVERABLE TO
## TIME OF DECREE

In actions for damages resulting from nuisance or continuing acts, damages are recoverable up to the time of trial: Humphrey v. Irvin, 3 Sadler 272, 18 W. N. C. 449 (1886); Glasgow v. Altoona, supra.

"It is not necessary to cite any authority for the proposition that damages in actions ex delicto are not restricted to the period ending with the institution of suit": Cheltenham & Abington Sewerage Company v. Pennsylvania P. U. C., 146 Pa. Superior Ct. 274, 288 (1941).

## DETENTION DAMAGES

Detention damages in lieu of interest for delay are recoverable. Mr. Justice Mitchell, in Richards v. Citizens Natural Gas Company, 130 Pa. 37, 39-40, 18 Atl. 600 (1889), stated the law:

"But there are cases sounding in tort, and cases of unliquidated damages, where not only the principle on which the recovery is to be had is compensation, but where also the compensation can be measured by market value, or other definite standards. Such are cases of the unintentional conversion or destruction of property, etc. Into these cases the element of time may enter as an important factor, and the plaintiff will not be fully compensated unless he receive, not only the value of his property, but receive it, as nearly as may be, as of the date of his loss. Hence, it is that the jury may allow additional damages, in the nature of interest, for lapse of time. It is never interest as such, nor as a matter of right, but compensation for the delay, of which the rate of interest affords the fair legal measure."

The above case was quoted with approval in Waugh v. Commonwealth, 394 Pa. 166, 146 A. 2d 297, 300, note 5 (1958). See also City of Allegheny v. Campbell & Son, 107 Pa. 530, 535 (1885); 96 A. L. R. 18, supplemented in 36 A. L. R. 2d 337.

## INJUNCTIVE RELIEF

Equity has jurisdiction to restrain a public or private nuisance created by air pollution: Brookhaven Borough v. American Rendering, Inc., 434 Pa. 290, 256 A. 2d 626 (1969).

The chancellor does not readily perceive, in the absence of any evidence from either side on the subject, how injunctive relief could be either defined or practically enforced against the further fallout of lead particulate from the smelting operations conducted by Sitkin Smelting and Refining, Inc. Said defendant continues to fire its brass smelting furnaces and there is no way of foretelling how effective said operation will be. It is to be hoped that, hereafter, said defendant will maintain and operate said furnaces and the pollution control equipment in an efficient manner and in the event of a breakdown of said pollution control equipment said defendant will forthwith shut down the furnaces until said pollution control equipment can be properly repaired.

We recognize the importance of secondary brass smelting operations in our ecology because they recycle brass metal scrap and after the proper mix of elements in the smelter produce an ingot of desired metal components. Without secondary brass smelting operations said metal scrap would not be conserved and utilized.

However, it should be noted the award of damages hereinafter made represents compensation only for

liability accruing to the date of the hearings herein, and would not preclude the due prosecution of further actions for subsequent damages which conceivably may be determined at some time in the future to have been reasonably avoidable or the result of defendant's negligent activity or inactivity after that date.

To prevent a multitude of actions, equity, having assumed jurisdiction, will retain it and grant complete relief, although it ultimately results merely in a money decree: Lafean v. American Caramel Company, 271 Pa. 276, 283, 114 Atl. 622 (1921).

## ADDITIONAL DEFENDANTS

No testimony was presented to establish liability on the part of Lewistown Materials Company. What little testimony there was to establish liability on the part of American Viscose Corporation and FMC Corporation was inconclusive and weak. Plaintiffs' uncontracted evidence was that their cattle never were across the highway where they could drink from Jacks Creek, that their cattle became sick a year or more before plaintiffs irrigated and that the irrigation was only in 1963 and 1965 and was limited to a minor portion of the acreage, that the trucks hauling Viscose waste never got to any field used by the cattle and said trucks were never used by plaintiffs to haul provender. FMC showed a controlled emission from their dump into Jacks Creek within approved Commonwealth standards. Soil and water samples taken east or up stream from the dump and which could not be affected by the dump but were in the fallout area of the smelters, were abnormally high in lead. It was clearly established by the evidence that the lead that caused plaintiffs' damages came from the smelters operated by Sitkin Smelting and Refining, Inc., and not from sources contended by defendants.

## SUMMARY OF LIABILITY

In summary, the invasion of plaintiffs' interests by Sitkin Smelting and Refining, Inc., defendant, consisted in knowingly and intentionally conducting its brass smelting operations without any pollution controls from 1959 to 1967 and knowingly and intentionally installing and operating a secondhand lead blast furnace from 1961 to 1965 by persons having no technical qualifications for the design, installation and operation thereof, which said lead blast furnace had been known by said defendant prior to its purchase by it to have had fume problems, in operating same in a structure that had no sides, thereby permitting lead fumes to be dissipated into the atmosphere, in operating same with an ineffective filtering system and at nighttime, even when the filtering system had broken down, as it frequently did, in failing to consult a technically qualified person on effective air pollution control as to design and operation of the filtering system for the lead smelting operations, in continuing said brass smelting and lead smelting operations after being advised on or about December 10, 1963, of plaintiffs' damages from lead poisoning coming from said smelting operations and after being advised by letter of March 22, 1965, from the Regional Air Pollution Control Engineer on behalf of the Commonwealth of Pennsylvania that the results of the stack tests performed September 17 and 18, 1964, and the air sample tests begun May 14, 1964, by the Bureau of Air Pollution Control for the Department of Health, Commonwealth of Pennsylvania showed that excessive quantities of particulate matter were being emitted to the atmosphere from the brass furnace and that the lead concentrations in the atmosphere were at times unusually high and in delaying with compliance of an order of the Air Pollution Com-

mission of the Department of Health, Commonwealth of Pennsylvania, issued on February 11, 1966, to abate its air pollution problem within 300 days.

## CONCLUSIONS OF LAW

1. Jursidiction of the subject matter lies in the Court of Common Pleas of Mifflin County because the tortious conduct occurred in Mifflin County. Jurisdiction over defendants and additional defendants was acquired by personal service within Mifflin County.

2. Lead and brass smelting operations in a rural and residential area are not a nuisance per se but may become a nuisance in fact if improperly conducted.

3. The invasion of plaintiffs' interest in the private use and enjoyment of their land by Sitkin Smelting and Refining, Inc., was substantial.

4. The conduct of Sitkin Smelting and Refining, Inc., was a legal cause of said invasion.

5. Said invasion was intentional and unreasonable.

6. The utility of the conduct of Sitkin Smelting and Refining, Inc., defendant, was outweighed by the gravity of the harm done to plaintiffs by said defendant.

7. Sitkin Smelting and Refining, Inc., was negligent in the operation of its brass and lead smelters.

8. Said negligence was the proximate and legal cause of the substantial damages sustained by plaintiffs.

9. The smelting operations of Sitkin Smelting and Refining, Inc., constituted a private nuisance in fact to plaintiffs.

10. Legal injury to plaintiffs' crops, livestock and their persons by the activities of Sitkin Smelting and Refining, Inc., defendant, having been proven, the

burden was upon said defendant to prove such injury was not reasonably avoidable.

11. Sitkin Smelting and Refining, Inc., has failed to discharge the burden of proving that the injury to plaintiffs' crops, livestock and their persons was not reasonably avoidable.

12. Sitkin Smelting and Refining, Inc., is liable in damages to plaintiffs on the theory of intentional and unreasonable invasion.

13. Sitkin Smelting and Refining, Inc., is liable in damages to plaintiffs on the theory of negligence.

14. Sitkin Smelting and Refining, Inc., is liable in damages to plaintiffs on the theory of nuisance.

15. Sitkin Smelting and Refining, Inc., is not liable in damages to plaintiffs on the theory of ultrahazardous activities.

16. Plaintiffs are not entitled to injunctive relief to compel Sitkin Smelting and Refining, Inc., to cease and prevent further deposit of lead particulate upon plaintiffs' premises for the reason that such relief cannot be specified with particularity and would be impossible or highly impracticable of enforcement under all the circumstances now existing. Such refusal of equitable relief presently, however, is totally without prejudice to any separate action or causes of action which may arise or accrue by reason of the continuance of any legal injury to plaintiffs' premises, their livestock and their persons after date of the hearings herein.

17. Sitkin Smelting and Refining, Inc., is liable to plaintiffs for damages as itemized in our finding of fact no. 109, which said damages total $52,623.30.

18. Sitkin Smelting and Refining, Inc., shall pay the costs of this proceeding.

19. This proceeding as to all remaining original defendants and additional defendants is dismissed.

## DECREE NISI

And now, this January 31, 1973, for the reasons stated in the foregoing adjudication, it is ordered and decreed that plaintiffs' prayers for injunctive relief as set forth in their amended complaint be denied and refused, but that damages be awarded plaintiffs and against Sitkin Smelting and Refining, Inc., in the sum of $52,623.30, Sitkin Smelting and Refining, Inc., to pay the costs of the within proceeding. The proceeding as to all remaining original defendants and additional defendants is dismissed.

It is further ordered that this decree shall be entered as a decree nisi and shall become the final decree of the court unless exceptions be filed hereto within 20 days from this date. The prothonotary shall serve copies of the within decree nisi and the foregoing adjudication upon counsel of record forthwith in person or by mail.